**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**CHARMER INDUSTRIES, INC., et al., Defendants,**

and

**Peerless Importers, Inc.,**
**Defendant-Appellant.**

No. 1338–267, Dockets 83–1135, –1321.

United States Court of Appeals,
Second Circuit.

Argued Sept. 1, 1983.

Final Briefs Submitted Sept. 15, 1983.

Decided Nov. 30, 1983.

and surely does not permit a judicial grafting of stringent conditions on the power of trustees. As for its legislative history, the words "upon cause shown" were dropped by the Congress from the predecessor to Section 363(b) in 1978, a signal clearly dictating that Congress meant what it said.

The equity holders argue that Chapter 11's provisions for disclosure, hearing and a vote before confirmation of a reorganization plan stringently limit the authority of trustees under 11 U.S.C. § 363(b). However, a reorganization plan affects the rights of the parties as well as the disposition of assets, and there is no inconsistency in allowing the disposition of property outside the confirmation proceedings. Arguably, some transactions proposed under Section 363(b) would, if carried out, eliminate a number of options available for reorganization plans and thereby pre-ordain a particular kind of plan or preclude a reorganization entirely. In such a case, a colorable claim can be made for a limitation on a trustee's power under Section 363(b) narrowly tailored to prevent such a result in order to effectuate the core purposes of Chapter 11. However, it is not disputed that in the present case the final reorganization plan will include a sale of Dale stock. A sale now thus does not preclude any feasible reorganization plan.

John H. Gross, New York City (John H. Doyle, III, Anderson, Russell, Kill & Olick, P.C., New York City, on brief), for defendant-appellant.

Thomas F. Clauss, Jr., New York City (Stephen A. Weiner, Winthrop, Stimson, Putnam & Roberts, New York City, on brief), for Arizona Atty. Gen.

Before FRIENDLY, KEARSE and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

This appeal by Peerless Importers, Inc. ("Peerless"), presents a question as to the scope of the injunctive order that should be entered following the unauthorized acquisition of a confidential presentence report prepared for the court by the United States Probation Service ("USPS"). In our earlier opinion in this case, *United States v. Charmer Industries, Inc.,* 711 F.2d 1164 (1983) ("*Charmer I*"), we restricted publication or other use by the Attorney General of the State of Arizona ("Arizona AG") of a presentence report on Peerless ("Peerless Report" or "Report") that had been prepared by USPS in an antitrust action in the Eastern District of New York in which Peerless was a defendant. Upon the issuance of our mandate in *Charmer I* on July 15, 1983, the United States District Court for the Eastern District of New York, Charles P. Sifton, *Judge,* entered an order that prohibited the Arizona AG from "making any publication or other use of any portion of the Report or of any information derived therefrom." On July 26, 1983, the district court modified its order ("Modified Order") to delete the prohibition on use of "derived" information. Peerless contends that both our opinion in *Charmer I* and improper conduct by the Arizona AG require the reversal of the Modified Order

and the entry of an order prohibiting the Arizona AG from using both the Report and any information derived from it. In addition, Peerless asks us to hold the Arizona AG, the Chief Counsel of the Financial Fraud Division of the Arizona AG, two Assistant Arizona AGs, and the Superintendent of the Arizona Department of Liquor Licenses and Control ("DLLC") (collectively referred to as the "Arizona AG, *et al.*") in civil and criminal contempt of court because of breaches by the Arizona AG of promises, made by his representative to this Court during oral argument on *Charmer I,* not to use the Report.

For the reasons below, we deny the contempt motion, and we vacate the Modified Order in part, with instructions to enter a new injunctive order.

## I. BACKGROUND

For purposes of the present appeal, we assume familiarity with *Charmer I* and summarize only briefly the important events leading to that appeal.

In 1982 the DLLC commenced a proceeding to revoke the liquor license of All American Distributing Co., Inc. ("All American"), a Peerless affiliate, in part on account of Peerless's plea of guilty to price fixing in the antitrust action. On March 7, 1983, Arizona Assistant Attorney General Therese L. Martin obtained the unauthorized disclosure of USPS's presentence report on Peerless. Martin then caused to be prepared an amended complaint in the DLLC proceeding in which the first paragraph, based on the Peerless Report, charged that Peerless had ties to organized crime. Martin delayed action on filing the amended complaint while she attempted to obtain written confirmation that it was permissible for the Arizona AG to use the Peerless Report. On March 24, however, when Martin was notified that Peerless intended later that day to ask Judge Sifton to enjoin the Arizona AG from publishing, discussing, or using the Report, Martin reported this to her superior, causing the amended complaint to be filed in the state proceeding immediately, without awaiting the normally

required permission of the DLLC hearing officer.

Judge Sifton subsequently denied Peerless's motion to forbid the Arizona AG's use of the Report. Peerless immediately appealed and moved for a stay pending appeal. The motion was granted on April 12 by a panel of this Court on the condition that Peerless agree to an adjournment of a scheduled hearing in the DLLC proceeding. Peerless declined so to agree, however, and on April 15 an order was entered denying the stay.

### A. Oral Argument in Charmer I and Events Prior to the Decision

On April 29, 1983, oral argument in *Charmer I* was heard, during which the following colloquy occurred between Martin and the Court:

> JUDGE FRIENDLY: And when you finish up, I suppose you intend to release this [Report] to the media too, don't you?
>
> MS. MARTIN: Your Honor, if it is admitted at the hearing, it would be a matter of public record.
>
> JUDGE FRIENDLY: Or do you plan to before the hearing?
>
> MS. MARTIN: No, Your Honor.
>
> JUDGE FRIENDLY: You agree you won't do that?
>
> MS. MARTIN: Yes, I [would] agree I would not do that, except in the context of perhaps using it in a deposition.

(Transcript of Excerpts from April 29, 1983 Argument ("Tr. Excerpts") at 3.)[1] At the close of oral argument, decision was reserved.

On May 4, 1983, during a deposition of the Superintendent of the DLLC in connection with the state proceeding, the Superintendent indicated, in response to questioning by counsel for All American, that Paragraph I of the amended complaint, which charged that Peerless had ties to organized crime, was based on the Peerless Report and would have to be withdrawn if the Report could not be used to substantiate it.

On May 16, counsel for Peerless filed a motion requesting a transcript of the oral argument of *Charmer I* from the Court, stating that he believed that Martin had promised she would not use the Report until this Court rendered its decision. The Court ordered a transcript prepared. On May 19, Martin wrote to counsel for Peerless, stating that her contrary recollection was that she had represented to the Court that she planned to use the Report at depositions and in the state court hearing. By motion dated May 25, filed on June 1, Martin moved for her own copy of the transcript of the oral argument from the Court. On June 3 she was advised by a deputy clerk of the Court that the tape was inaudible or indecipherable. On June 10, the Court granted Martin's motion to the extent that the tape was audible and a transcript could be made.

On June 16, the Arizona AG, in papers signed by Martin, moved in the state proceeding for an extension of the deadline for giving notice of the witnesses to be called at the DLLC hearing. With this motion Martin filed a "Memorandum of Law" ("DLLC Memorandum") asserting that the charges made in Paragraph I of the amended complaint were not brought until the Arizona AG received a copy of the Peerless Report indicating that Peerless had ties to the Colombo organized crime family.

### B. The Decision in Charmer I and the Post-Decision News Article

On June 28 we filed our decision in *Charmer I*, reversing the district court's refusal to enjoin use of the Peerless Report by the Arizona AG. We remanded the matter to the district court

> for entry of an injunctive order requiring the Arizona AG to return to the court the Peerless Report and all copies and extracts made of it, prohibiting his publication or other use of any portion of the Report that is not already publicly availa-

---

1. Although Judge Sifton found that "[t]he parties are in apparent agreement that [this] transcript accurately reflects the passages excerpted," (Findings, Recommendation, and Report of Judge Sifton dated August 30, 1983, at 24 n. 5), we have listened to the tape itself and find that the bracketed word "would" should have been included. *See also* note 6 *infra*.

ble, and for such other relief as, consistent with this opinion, may be appropriate. 711 F.2d at 1178. In the belief that the stay conditionally granted by the prior panel had become effective, *see id.* at 1169, we also stated that

> [t]he stay granted by this Court on April 12, 1983, shall remain in effect pending entry of the mandated injunctive relief in the district court.

*Id.* at 1178.

Pursuant to Fed.R.App.P. 41(a), our mandate in *Charmer I* was scheduled to issue on July 19. Sometime in late June or early July, Martin gave the DLLC Memorandum and several other documents to a reporter for *The Arizona Republic.*[2] These disclosures resulted in a front-page article in *The Arizona Republic* on July 5, entitled " 'Devastating witness' lined up in bid to revoke 'mob' liquor licenses." The article reported that

> [a] federal court presentence report prepared in connection with the price-fixing case indicates that Peerless had "ties to the Colombo organized-crime family," according to a Liquor Department memorandum.

### C. *The Contempt Motion and the Injunctive Orders*

On the basis of the July 5 news article, Peerless moved in this Court on July 11 to hold the Superintendent of the DLLC and various officials of the Arizona AG's office, including Martin, in civil and criminal contempt. On July 15, we expedited issuance of the mandate in *Charmer I* and designated Judge Sifton a special master to hold a hearing and to make a written recommendation for the disposition of the contempt motion. That same day, Judge Sifton entered an order ("July 15 Order") which, in pertinent part, prohibited the Arizona AG "from making any publication or other use of any portion of the Report *or of any information derived therefrom*" (emphasis

added) that was not publicly available before March 7, 1983.

The Arizona AG quickly moved for a modification of the July 15 Order to delete the portion that prohibited the use or publication of information derived from the Report. On July 26, Judge Sifton granted the motion and entered the Modified Order, which provided, in pertinent part, that the Arizona AG was enjoined "from making any publication or other use of any portion of the Report," and deleted the language of the July 15 Order emphasized above.[3]

On July 28, this Court granted a stay of Judge Sifton's order modifying the July 15 Order pending determination of the present appeal.

### D. *Findings on the Contempt Motion*

On July 26, Judge Sifton also held a hearing on the contempt motion, receiving testimony by Martin and others. Martin testified that she was uncertain of the date on which she gave the DLLC Memorandum to the newspaper reporter, although she thought it might have been June 26. She also testified that she was unaware that either discussing the Peerless Report in the DLLC Memorandum or then giving that memorandum to the press was contrary to the undertaking she had made at oral argument not to disclose the Report. Martin testified that she believed she was free to use the Report in a deposition, a hearing, or a memorandum of law; and because the DLLC Memorandum was a matter of public record, Martin believed she was free to give it to the newspaper reporter.

Judge Sifton issued his report on the contempt hearing on August 30 and credited all of Martin's testimony. He also found that the colloquy between Martin and the Court had "[l]eft up in the air" the matter of whether Martin could make public refer-

---

2. Martin also gave the reporter copies of the moving and opposition papers on motions by All American to strike witnesses and exhibits and to bar the testimony of five witnesses.

3. The July 15 Order required the Arizona AG to return to the Court the Peerless Report and all copies and extracts made of it. This requirement was not altered by the Modified Order and is not at issue in this appeal.

ence to the contents of the Peerless Report, as contrasted with furnishing the document itself. Judge Sifton recommended that none of the respondents to the contempt motion be held in either criminal or civil contempt, concluding as follows:

> In summary, I find that Ms. Martin did agree, during oral argument of the appeal on April 29, 1983, that she would not make available to the press a copy of the presentence report which was the subject of the appeal, pending its disposition, except by offering it in evidence at the hearing on the license revocation proceeding or in the course of a deposition in preparation for that hearing. I find, however, that there was no clear and unequivocal direction or understanding established during the course of oral argument as to what conduct was expected from Ms. Martin with regard to use of the information contained in the probation report in the ordinary course of on-the-record litigation before the Arizona Liquor Control Board during the pendency of the appeal in situations not involving the offer of the document in evidence. I further find that Ms. Martin did not either expressly or by implication agree or represent to the Court that she would not use or publish the contents of the report under any circumstances until the appeal was decided. I further find that Ms. Martin's publication of a portion of the information contained in the pre-sentence report by placing in the public file and, later, making available to a reporter a copy of her June 16, 1983 memorandum with reference to the Superintendent's new list of witnesses was not done either with a purpose of doing what she had agreed not do [*sic*] do, or with knowledge that what she was doing was probably contrary to her agreement and with deliberate indifference to the question whether her conduct was in violation of her agreement.

(Findings, Recommendation, and Report of Judge Sifton dated August 30, 1983, at 20–21 ("August 30 Report").)

## II. DISCUSSION

In pursuit of its motion to hold the Arizona AG, *et al.,* in contempt, Peerless contends that Judge Sifton erred in crediting Martin's self-serving testimony and that in fact, Martin's actions constituted a flagrant disregard of her promise to this Court on April 29. On its appeal from the Modified Order, Peerless argues that the Modified Order, which ostensibly allows use of information "derived from" the Peerless Report, is contrary to this Court's directive in *Charmer I.* In addition, Peerless argues that even if *Charmer I* did not clearly direct a prohibition on use of information derived from the Report, such a prohibition is warranted by (1) the policies set forth in *Charmer I* supporting nondisclosure of presentence reports, (2) the need to deter unauthorized disclosures, and (3) the Arizona AG's improper conduct in disclosing the contents of the Peerless Report to the press.

Although we consider Martin's conduct reprehensible, we feel compelled to accept Judge Sifton's findings as not clearly erroneous and to deny the contempt motion principally because there was not a clear directive from this Court which barred the actions undertaken by Martin. As to the proper scope of the injunction, we consider the July 15 Order of the district court, with its prohibition on derivative use, to be closer to the directive of *Charmer I* than is the Modified Order, with its implicit allowance of such use. We therefore reverse the Modified Order and direct the entry of an injunction that bars all use by the Arizona AG of the Peerless Report.

### A. *The Contempt Motion*

█ We are greatly troubled by several aspects of Martin's conduct in this matter. Martin has defended her description in the DLLC Memorandum of the Peerless Report's attribution to Peerless of organized-crime ties by drawing a distinction between the Report itself and the contents of the Report. Thus, she stated that she had told the Court on April 29 "only that [she] would not give the news media a copy of the

Report itself," (Affidavit of Therese L. Martin, dated July 21, 1983 ("Martin July 21 Aff."), ¶ 8), and that she did not promise not to repeat the substance of the Report to the media, (*See* Transcript of Hearing on Contempt Motion, July 26, 1983, ("Contempt Tr.") at 30.) We regard this as a hypertechnical distinction that is unworthy of an officer of the court. Whether one should even credit Martin's professed belief that such a distinction could exempt her actions from the scope of her undertaking is also questionable, as the following colloquy at the contempt hearing discloses:

THE COURT: Are you making a distinction in your response between releasing a copy of the report and characterizing its contents?

THE WITNESS [Martin]: Yes.

THE COURT: It was your understanding that you were free to—did you think you could walk out of that argument and, if grabbed by a reporter for the Arizona newspaper and asked what is in the report that everybody is so interested in, as far as you were concerned you thought you were free to tell him?

THE WITNESS: No.

(*Id.* at 42–43.)

We note also an aura—apparent at least from the transcript—of equivocation as to when Martin actually gave the DLLC Memorandum to the press. When first asked at the hearing when this had occurred, Martin stated, "I *don't believe* it was after the Second Circuit opinion."[4] (*Id.* at 29 (emphasis added).) Martin learned of the opinion in *Charmer I* on the day it was filed,

(Martin July 21 Aff. ¶ 14), and it is difficult to believe that the news that she had lost the appeal would not make a sufficient impression to allow her to state with certainty whether she delivered the memorandum before or after receiving that news. Peerless argues that the fact that the news article did not appear in print until July 5 suggests that Martin did not give the DLLC Memorandum to the press until after June 28. Martin set the date on which she made the delivery as "approximately the week of—early in the week of—the 27th, the 26th, of June, I believe." (Contempt Tr. at 29.) The notion that it took the reporter nine days to read the DLLC Memorandum and the other documents handed him by Martin and to write a story that was deemed sufficiently newsworthy to merit front-page status does seem unlikely. And the hypothesis that Martin gave the press the document describing the Peerless Report after she realized she was about to be enjoined,[5] is of a piece with the earlier action of rushing to get the amended complaint, with its use of the Peerless Report material in Paragraph I, into the public record as soon as Martin learned that Peerless would seek an injunction against the Arizona AG's use of the Report.

Nonetheless, Judge Sifton, who conducted the contempt hearing at our behest, has made findings that credit Martin's testimony. He found that Martin did not represent to the Court that she would not use or publish the "contents" of the report (August 30 Report at 21), and that Martin did not act "with a purpose of doing what she had agreed not [t]o do, or with knowledge

---

**4.** Martin's testimony as to the timing of her delivery was as follows:

Q Who gave the memorandum you filed to the newspaper?
A I gave a copy of the memorandum—
Q To the newspaper?
A To Mr. Sitter.
Q The newspaper reporter?
A Yes.
Q After the Second Circuit opinion?
A I don't believe it was after the Second Circuit opinion.

Q When did you give the memorandum you filed to the newspaper reporter?
A It was approximately the week of—early in the week of—the 27th, the 26th, of June, I believe.
(Contempt Tr. at 29.)

**5.** Martin knew that there was in fact no formal stay in effect at that moment notwithstanding our statement in *Charmer I,* 711 F.2d at 1178, that the April 12 stay would remain in effect pending entry of an injunction by the district court. (*See* Martin July 21 Aff. ¶ 4.)

that what she was doing was probably contrary to her agreement and with deliberate indifference to the question whether her conduct was in violation of her agreement." (*Id.*) Although we would not have made these findings on the basis of the cold record, Judge Sifton saw and heard the witness and the burden on Peerless of showing that his findings are clearly erroneous is a heavy one. *NLRB v. Local 825, A, B, C, D, International Union of Operating Engineers,* 659 F.2d 379, 383 (3d Cir.1981); *NLRB v. Remington Rand, Inc.,* 130 F.2d 919, 925 (2d Cir.1942); *see* Fed.R.Civ.P. 53(e)(2). We are not persuaded that the burden has been met, and we are thus constrained to uphold Judge Sifton's findings.

■ More importantly, Judge Sifton found that the understanding established at the April 29 oral argument was not "clear and unequivocal" (August 30 Report at 20), and in light of that circumstance we may not hold Martin or her colleagues in contempt. It is well settled that a court may not hold a person in contempt unless he has violated a definite and specific order of the court. *E.g., UFI Razor Blades, Inc. v. District 65, Wholesale, Retail, Office and Processing Union,* 610 F.2d 1018, 1024 (2d Cir. 1979). "The judicial contempt power is a potent weapon" that can be "deadly" when it is issued for violation of a directive that was "too vague to be understood," *International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967), and "it behooves the court, in the first instance or on appeal, to make certain that an order of this court is violated before a citation issues," *United States v. Wendy,* 575 F.2d 1025, 1030 (2d Cir.1978).

It is clear that no formal order had been issued here. First, although this panel was under the impression that the conditional stay entered on April 12 had gone into effect and was pending, in fact no such order had been entered because Peerless had chosen not to agree to an adjournment of the DLLC hearing.[6] Further, although the eventual denial of a stay on April 15 had been "without prejudice," counsel for Peerless did not request a stay at oral argument on April 29. Thus, there was no formal order of the Court extant for the Arizona AG to have violated.

Second, we recognize that the colloquy at oral argument between Martin and Judge Friendly[7] may be read hypertechnically as barring only the release of a copy of the Report and not the recitation of its contents. While we find it difficult to view Martin's disclosure in reliance on such a distinction as an act in good faith, we may not predicate a contempt citation on an agreement that has such a loophole.

---

**6.** Notwithstanding Peerless's refusal to agree, the DLLC hearing was later adjourned.

**7.** There is no merit in Peerless's suggestion that a clear undertaking on Martin's part not to use the Report in any way was reflected in a comment from the Court as follows:

> JUDGE KEARSE: It might be best to get the report back. Miss Martin said she was willing to withhold it until there is some decision from the bench.

(Tr. Excerpts at 5.) Although the parties apparently agreed on this transcription, *see* note 1, *supra,* Judge Sifton noted that the "comment itself is difficult to hear on the tape recording," (August 30 Report at 11). We have listened to the tape and, aided by having been present, find the comment more audible and different.

The comment occurred in the context of a discussion as to what showing USPS had made to Judge Sifton in order to justify approval for release of the Report to the Arizona AG. Peerless's counsel suggested that the USPS officials had found themselves unable to do anything other than seek approval because they were embarrassed by the earlier inadvertent release of the Report. The comment that followed, mistranscribed above, was

> JUDGE KEARSE: They could have asked to get the Report back. Miss Martin said she was willing to withhold it until some decision had been made.

The statement attributed to Miss Martin had no reference to anything said by her at oral argument in the Court of Appeals, but rather referred to statements she had made to government officials prior to Peerless's injunction motion, as reflected by the record in the district court. (*See* Affidavit of Therese L. Martin dated March 30, 1983, ¶¶ 18, 21.)

Accordingly, Peerless's motion to hold the Arizona AG, *et al.,* in contempt is denied.

B. *The Proper Scope of the Injunction*

■ Our opinion in *Charmer I* directed the district court to enter an injunctive order "prohibiting [the Arizona AG's] publication or other use of any portion of the Report that is not already publicly available." 711 F.2d at 1178. The phrase "or other use" is not one that would normally be construed as limited and we did not so intend it. As used in our opinion, the phrase was meant to result in a prohibition on publication and on *any* other use of nonpublic information in the Report. Our language was therefore broad enough to direct a prohibition against even derivative use.

The district court's Modified Order, if viewed without reference to its forefather, the July 15 Order, is literally consistent with our mandate since it enjoins "publication or other use." Viewed, however, as a truncated version of the original July 15 Order which prohibited not only "publication or other use" but also, explicitly, "any information derived" from the Report, the Modified Order must be read as reflecting the district court's intention not to prohibit "derivative" use of the Report. This implicit grant of permission to the Arizona AG to make "derivative" use of the Peerless Report is not consistent with our directive in *Charmer I.*

We wish to make plain beyond cavil, therefore, that the order to be entered on remand must make clear that the prohibition extends to publication and any other use of any portion of the Peerless Report that was not, prior to March 7, 1983, already publicly available. Included in this ban are, for example, any use of the Report as an exhibit, any quotation of the nonpublic contents of the Report, any reference to such contents in a question, any paraphrase of such contents, and any reference to such contents in general terms. This listing is not intended either to be complete or to provide for an *ejusdem generis* inference. Any use of any nonpublic portion of the Report is to be prohibited.

The prohibition on any use of a presentence report—including derivative use—follows from the reasons for maintaining the confidentiality of such reports, which we set forth in some detail in *Charmer I,* 711 F.2d at 1175–76. Cases discussing the necessity of preserving the secrecy of grand jury materials—which we regarded in *Charmer I, id.* at 1175, as analogous to the question of disclosure of presentence reports—also support such a broad prohibition on use of the Report. *See, e.g., Illinois v. Abbott & Associates, Inc.,* —— U.S. ——, 103 S.Ct. 1356, 1361–64, 75 L.Ed.2d 281 (1983); *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 218–19, 99 S.Ct. 1667, 1672–1673, 60 L.Ed.2d 156 (1979). The total ban on use of the presentence report in this case is further justified by the course of conduct adopted by the Arizona AG, which, throughout, has appeared to reflect a greater interest in publicizing the contents of the Peerless Report than in unearthing their factual basis.

Nonetheless, our directive in *Charmer I* was not intended to prohibit the Arizona AG from undertaking an investigation that might parallel that conducted by the USPS. Thus, in noting that the Arizona AG had not made a showing of a compelling need for disclosure of the Report in the interests of justice, we pointed out that he

> ha[d] made no showing that [he] cannot learn from government attorneys the identities of the law enforcement officials who have collected the pertinent information.

711 F.2d at 1178. Likewise our clarification here does not preclude the Arizona AG from contacting law enforcement officials in order to obtain any pertinent information. We would regard such a ban as inappropriate in the present circumstances for two reasons. First, attribution to Peerless of ties to organized crime had appeared in the press several months before Martin gained

her unauthorized possession of the Peerless Report. Thus, in the course of a properly conducted investigation, the Arizona AG could have been expected to contact law enforcement officials to obtain information. Second, the Peerless Report does not identify either the law enforcement officials who provided the information to USPS or their sources for the information. Thus, although we can envision circumstances in which we would draw a different inference, we would not here construe the Arizona AG's contact of any particular law enforcement official as a "use" of the Peerless Report.

## CONCLUSION

The Modified Order is vacated insofar as its use of the phrase "publication or other use" might be interpreted not to include derivative use. The cause is remanded for entry of an injunctive order, consistent with this opinion, permitting the Arizona AG and the other persons listed in the second "ORDERED" paragraph of the Modified Order to contact law enforcement officials with respect to information the latter may have on Peerless but enjoining the Arizona AG, *et al.,* from making any use in any way, by publication or otherwise, of any portion of the Peerless Report that was not already publicly available before March 7, 1983.

Costs to Peerless. The mandate shall issue forthwith.