**SECURITIES AND EXCHANGE COMMISSION,**
**Plaintiff-Appellant-Cross-Appellee,**

v.

**Christopher L. LOWE et al.,**
**Defendants-Appellees-Cross-Appellants.**

**Nos. 106, 173, Dockets 83–6108, 83–6116.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 19, 1983.
Decided Jan. 18, 1984.

---

Jacob H. Stillman, Associate Gen. Counsel, S.E.C., Washington, D.C. (Daniel L. Goelzer, Alan Rosenblat, David Sirignano, W. Robert Gray, Paul Gonson, Washington, D.C., of counsel), for plaintiff-appellant-cross-appellee.

Michael E. Schoeman, Schoeman, Marsh, Updike & Welt, New York City (Elizabeth H. Cooper, David A. Newberg, New York City, of counsel), for defendants-appellees-cross-appellants Lowe.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and BRIEANT, District Judge.*

OAKES, Circuit Judge:

An investment adviser registered under the Investment Advisers Act of 1940 was convicted on three different occasions of serious misconduct in connection with his investment advisory business. Pursuant to the Act, the Securities and Exchange Commission revoked his registration because of his convictions. He has nevertheless continued to publish and sell newsletters containing investment advice, in violation of the Act's requirement of registration. The interesting, if not altogether unique, question presented by this case is whether the publication of such advice is protected by the First Amendment so as to preclude the SEC from seeking to enjoin its continuance.

## FACTS

Christopher L. Lowe is the president of the three corporate entities involved in this case: Lowe Management Corp., Lowe Publishing Corp., and Lowe Stock Chart Service, Inc. Between March, 1974, and May, 1981, Lowe Management was registered with the SEC as an investment adviser pursuant to Section 203(c) of the Investment Advisers Act, 15 U.S.C. § 80b–3(c) (1976). As such it published investment advice and managed and had custody of the funds of its clients on a discretionary basis.

In 1977, Lowe was convicted of two New York misdemeanors relating to his investment advisory business.[1] He pleaded guilty to making false representations to a client that $2,200 had been invested for his benefit and a 27% return earned, when in fact Lowe had misappropriated the funds for his own use. He also pleaded guilty to failing to register in New York State as an investment advisor.

In 1978 Lowe was convicted of two New York felonies.[2] He pleaded guilty to tampering with physical evidence, involving the alteration of a copy of a $10 money order to have it appear to be for the amount of $10,000. In addition, he pleaded guilty to third degree larceny for fraudulently drawing checks on an account to which worthless checks had been deposited. For these convictions Lowe received a prison sentence and was ordered to make restitution to the client.

As a result of these convictions the SEC instituted administrative proceedings under Section 203 of the Investment Advisers Act, 15 U.S.C. § 80b–3(e) & (f) (1976), against Lowe and Lowe Management. The Commission found that Lowe had aided and abetted willful violations of the antifraud provisions of the Act, violated the reporting provisions of the Act, and failed to amend Lowe Management's investment advisory registration form to report the convictions which related to his conduct as an investment adviser. In assessing sanctions the Commission found that Lowe's conduct "could hardly be more serious[,] ... reflect[ing] a callous disregard" for the high

---

* Of the Southern District of New York, sitting by designation.

1. N.Y.Gen.Bus.Law § 352–c (McKinney 1968); N.Y.Gen.Bus.Law § 359–eee (McKinney 1968).

2. N.Y.Penal Law § 215.40 (McKinney 1975); N.Y.Penal Law § 155.30 (McKinney 1975).

fiduciary standards required of an investment adviser, and that the criminal conduct "clearly demonstrate[d] his total lack of fitness to remain in 'an occupation which can cause havoc unless engaged in by those with appropriate background standards.' " *In re Lowe Management Corp.*, SEC Investment Advisers Act of 1940 Release No. 759 (May 11, 1981) (quoting *Marketlines, Inc. v. SEC,* 384 F.2d 264, 267 (2d Cir.1967), *cert. denied,* 390 U.S. 947, 88 S.Ct. 1033, 19 L.Ed.2d 1137 (1968)). The Commission rejected the argument that sanctions were unnecessary because Lowe and his advisory corporation no longer handled clients' funds or securities, but only provided investment advice by publication. Noting that even these activities "afford numerous 'opportunities for dishonesty and self-dealing,' " *id.* at 5, the Commission revoked the registration of Lowe Management as an investment adviser and barred Lowe from association with any investment adviser. Lowe did not seek judicial review of the Commission's order.

Lowe's criminal activities did not end here, however. In 1982 he pleaded guilty to two charges under New Jersey law of theft by deception in the third degree,[3] for fraudulently misrepresenting that checks drawn on his personal and one of Lowe Publishing's accounts were good and negotiable. For these activities he was sentenced to a three-year prison term and probation, and ordered to make restitution of over $27,000 to the defrauded banks.

Despite the Commission's order of May 11, 1981, revoking Lowe's registration as an investment adviser and barring him from association with any investment adviser, Lowe has published and distributed two investment advisory services, the *Lowe Investment and Financial Letter* and the *Lowe Stock Advisory,* and solicited subscriptions for a third one, the *Lowe Stock Chart Service.* He is president, research chairman, and editor of all three services, and his corporations, Lowe Management, Lowe Publishing, and Lowe Service were the publishers of the newsletters. In addi-

tion, Lowe has offered a recorded telephone "hot-line" service to subscribers of six months or more. Despite these activities, he has not applied to register either himself or any of the corporations as an investment adviser.

The *Lowe Letter* has had from 3,000 to 19,000 clients, with an average of about 5,000. Subscriptions cost $39 for one year or $79 for three years. A typical *Lowe Investment and Financial Letter* gives a short-term and long-term forecast. It offers advice on the relative desirability of investing in, among other things, stocks, Treasury bills, and money market funds, and describes rather generally the state of the market. It recommends particular stocks and groups of stocks for purchase or sale, discusses precious metals, and announces special reports and the telephone hot-line service.

The *Lowe Stock Advisory* has only a few hundred subscribers and a number of readers who receive complimentary subscriptions. Subscriptions cost the same as do those to the *Lowe Investment and Financial Letter.* The *Stock Advisory* is typically somewhat more specific, however, with a brief introductory examination of general market trends followed by specific purchase, sale, and hold recommendations, particularly for low-priced stocks. The *Lowe Stock Chart Service* has solicited subscriptions, but has never been published.

No contention is made that any of the information published in the advisory services has been false or materially misleading. Nor is it alleged that Lowe himself, unlike the investment adviser in *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), has profited through personal or corporate investments from the investment advice rendered.

## THE DECISION OF THE DISTRICT COURT

The United States District Court for the Eastern District of New York, Jack B.

**3.** N.J.Stat.Ann. § 2C:20–4 (West 1982).

Weinstein, Chief Judge, believed that the Investment Advisers Act could not be construed to permit the SEC to revoke Lowe's registration as an investment adviser, and thus to bar him from publishing his newsletters, without violating the First Amendment. The court first analyzed the case on the assumption that the Lowe publications constituted commercial speech and thus were not entitled to the full protection of the First Amendment. *See In re R.M.J.,* 455 U.S. 191, 200–01, 102 S.Ct. 929, 935–936, 71 L.Ed.2d 64 (1982) (advertising by lawyers). It found, nevertheless, that "the censorship that the SEC would impose on Lowe is more extreme than necessary to effectuate the congressional goal of a confident and informed investing public," and amounted to an unconstitutional prior restraint on the basis of "speculative assessments." In reaching this conclusion the court apparently thought that the fact of Lowe's past misconduct was not in itself enough to make his future speech "potentially misleading" and consequently subject to restraint. *See Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 563–64, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980).

The court went on to suggest, however, that the case actually fell "outside the rubric of commercial speech." Although recognizing that the Supreme Court had never explicitly so held, Judge Weinstein stated that commercial speech consisted only of advertising, citing *Ad World, Inc. v. Township of Doylestown,* 672 F.2d 1136, 1140 (3d Cir.1982) (citing *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 850 (1982). As a result, he believed that Lowe's newsletters were fully protected by the First Amendment, and that their "combination of fact, economic and political analyses, conjecture, and recommendation characteristic of investment newsletters ... raises unanswered questions concerning the conditions, if any, under which an absolute restraint may constitutionally be imposed upon them."

Rather than rule the Act unconstitutional, however, the district court construed the Act's definition of an "investment adviser" so as to avoid possible infringement on freedom of the press. It did so by distinguishing personal or "person-to-person" advice from "impersonal" investment advice given in publications. The court evidently reasoned that "strong sanctions in the way of prior restraints" may be invoked against persons providing "personal" investment advice since that activity involves "delegations of trust and responsibility," but may not be invoked when the investment advice is provided by publication or writing. Accordingly, the court entered a limited injunction enjoining defendants from rendering personal investment advice "by telephone, individual letter or in person." As to "impersonal" advice, the court believed that disclosure, rather than denial or revocation of registration, was the only constitutionally permissible means of protecting the public.

In effect the court construed the Act so as to deny the SEC the authority to revoke a publisher's registration solely on the basis of past misconduct. Under this interpretation, a person whose registration is otherwise revoked may nevertheless remain registered as an investment adviser for the limited purpose of publishing so long as the publication is done "impersonally." A letter to several people rather than to an individual is thus differentiated. Somewhat inconsistently, perhaps, the district court treated Lowe's recorded hot-line telephone message as rendering "personal" rather than "impersonal" advice.

## DISCUSSION

■ We do not believe that the Investment Advisers Act may be rewritten as the district court would rewrite it. The Act does not distinguish between "personal" and "impersonal" advice, but rather between publications or writings "as to the value of securities or as to the advisability of investing in, purchasing, or selling securities," on the one hand, and "bona fide newspaper[s], news magazine[s], or business or

financial publication[s] of general and regular circulation," on the other. 15 U.S.C. § 80b–2(a)(11) (1976). The SEC quite properly determined that the Lowe advisory letters and services were the former, and that Lowe and his corporations were "engag[ing] in the business of advising others, either directly or through [such] publications or writings...." *Id.*

The statute specifically grants the SEC the power to revoke the registration of any investment adviser convicted of certain crimes, among these the crimes for which Lowe was convicted. 15 U.S.C. § 80b–3(e)(2). Accordingly, we believe that the SEC was well within its statutory authority when it revoked Lowe's registration. Unlike the district court, we do not believe that this statutory authority violates the First Amendment.

*The Act*

The Investment Advisers Act of 1940 was "the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the Depression of the 1930's." *SEC v. Capital Gains Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963). The Act was the result of a study undertaken by the SEC at the direction of Congress to investigate "the functions and activities of investment trusts and investment companies...." Section 30 of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79z–4 (1976). The SEC submitted to Congress a memorandum questioning "the good faith of some of the less reputable of these generalized investment services." Hearings on S. 3580 Before a Subcommittee of a Senate Committee on Banking and Currency, 76th Cong., 3d Sess. 47 (1940) at 1008. It emphasized the potential for abuse if persons in the business of publishing investment advice were willing to "lend[ ] themselves to the use of stock market promoters and manipulators." *Id.* (quoting *Twentieth Century Fund, Inc., The Security Markets* 692 (1935)).

On the basis of the SEC's report and other information before it, Congress found that investment advisers were "of national concern" and that "their advice, counsel, *publications, writings, analyses, and reports* ... occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, the national banking system and the national economy." Section 201 of the Investment Advisers Act, 15 U.S.C. § 80b–1 (emphasis added). In so finding, Congress hearkened back to Section 17(b) of the Securities Act of 1933, in which it prohibited the publication of any letter or investment service which describes a security without disclosing that the publisher has been compensated for such publicity, and to concerns expressed in the Senate Report accompanying the passage of the Securities Exchange Act of 1934. 15 U.S.C. § 77q(b) (1976) and S.Rep. No. 792, 73d Cong., 2d Sess. 8 (1934).

The Investment Advisers Act makes it unlawful for an unregistered investment adviser to make use of the mails or any means of interstate commerce in connection with his or its business as an investment adviser. 15 U.S.C. § 80b–3(a). The Act defines "investment adviser" broadly to include

> any person who, for compensation, engages in the business of advising others, either directly or *through publications or writings,* as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or *promulgates* analyses or reports containing securities....

15 U.S.C. § 80b–2(a)(11) (emphasis added). The section exempts from the definition of an investment adviser "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation...." *Id.* Section 203 provides for registration of investment advisers and gives the SEC powers of censure, denial, or suspension of registration. 15 U.S.C. § 80b–3(e). The SEC can censure an investment adviser, or suspend or revoke his registration if the adviser or any person associated with him has been convicted within ten years of certain felonies or mis-

**898**

demeanors.[4] The SEC invoked this statutory scheme to revoke the registration of Lowe Management and bar Christopher Lowe from publishing investment advice or associating with an investment adviser.

*The Act's Application to the Lowe Newsletters*

■ The first step in our analysis of this case is determining whether Lowe's newsletters are within the statutory definition of investment adviser and thus subject to the registration requirement, or whether they are "bona fide newspapers" and thus exempt from the requirement. The leading case construing the exclusion for bona fide newspapers is this circuit's *SEC v. Wall Street Transcript Corp.,* 422 F.2d 1371 (2d Cir.1970), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970). The *Wall Street Transcript* was a weekly tabloid which sold for $5 an issue or $180 per year. The *Transcript* consisted primarily of reports on specific securities, each of which was identified with the name and address of a broker/dealer firm. It also printed some management speeches, miscellaneous personnel announcements, editorials, and advertisements. This court held that the *Transcript* was not per se a "bona fide newspaper" or "financial publication of general and regular circulation" so as to be excluded from the definition of investment adviser. It stated that "[t]he phrase 'bona fide' newspaper ... means those publications which do not deviate from customary newspaper activities to such an extent that there is a likelihood that the wrongdoing which the Act was designed to prevent has occurred." 422 F.2d at 1377. Rather than looking to the purely formal "indicia" of a newspaper, the court examined the substance and content of the publication and

found that "[m]ost of its published material consists of reprinted reports assessing various securities issues." 422 F.2d at 1378. It held that "[t]his characteristic emphasis on particular issues and companies at the very least raises doubt about whether the *Transcript* is outside the exclusion—a suspicion which we believe that the S.E.C. should be allowed to investigate." *Id.*

The *Wall Street Transcript* presented a much closer case for exclusion under the Act than does the *Lowe Investment and Financial Letter* or the *Lowe Stock Advisory.* Lowe's newsletters quite clearly are "engage[d] in the business of advising others ... as to the value of securities or as to the advisability of investing in, purchasing, or selling securities ...." 15 U.S.C. § 80b–2(11). Under the test of *Wall Street Transcript,* it is equally clear that Lowe's publications are not engaged primarily in "customary newspaper activities," but rather in the activities that the Investment Adviser Act is intended to regulate. Thus, we hold that the SEC properly determined the registration requirements of the Act to be applicable to Lowe's newsletters.

*First Amendment Concerns*

■ *Wall Street Transcript* held that the Investment Advisers Act does not on its face abridge freedom of the press. In reaching this conclusion, the court stated that

> it is not necessary to enlarge the category of "bona fide" newspapers into an exclusion for all publications which could conceivably be brought within the term "typical newspaper" in order to avoid the "seeds of a constitutional controversy" which the appellee argues would result

---

4. The Commission may invoke the censure, suspension, and revocation provisions if it finds that such conviction

    (A) involves the purchase or sale of any security, the taking of a false oath, the making of a false report, bribery, perjury, burglary, or conspiracy to commit any such offense.

    (B) arises out of the conduct of the business of a broker, dealer, municipal securities dealer, investment adviser, bank, insurance company, or fiduciary;

    (C) involves the larceny, theft, robbery, extortion, forgery, counterfeiting, fraudulent concealment, embezzlement, fraudulent conversion, or misappropriation of funds or securities; or

    (D) involves the violation of section 152, 1341, 1342, or 1343 or chapter 25 or 47 of Title 18.

15 U.S.C. § 80b–3(e)(2).

from an attempt to regulate the conduct of any newspaper publisher.

422 F.2d at 1378–79. Nor did the court believe that it had "to base a construction of the Act on the assumption that the activities involved in giving commercial investment advice are entitled to the identical constitutional protection provided for certain forms of social, political or religious expression." *Id.* at 1379. Instead, the court reasoned that it need only delineate "a boundary between the special type of 'merchandising' activities which must lead to registration and the publication of expression which lies beyond the Act's regulatory purposes." *Id.* In reaching this conclusion, the court cited comments by Justice Harlan in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). *See* 422 F.2d at 1379. In that case, Justice Harlan said:

> A business "is not immune from regulation because it is an agency of the press. The publisher of a newspaper has no special immunity from the application of general laws ...." Federal securities regulation, mail fraud statutes, and common-law actions for deceit and misrepresentation are only some examples of our understanding that the right to communicate information of public interest is not "unconditional." (Citations and footnotes omitted).

388 U.S. 130, 150, 87 S.Ct. 1975, 1989, 18 L.Ed.2d 1094 (1967). Accordingly, the court held that the registration provisions of the Investment Advisers Act did not violate the First Amendment. 422 F.2d at 1379–80.

The appellees argue that *Wall Street Transcript* is inapplicable to this case because it was decided prior to *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). In *Virginia Pharmacy,* the Court invalidated a Virginia statute prohibiting pharmacists from advertising their prices, pointing out that the right to distribute and receive information affecting decisions to buy and sell must be protected in a free society. "[T]he free flow of commercial information is indispensable ... to the proper allocation of resources in a free enterprise system ... [and] to the formation of intelligent opinions as to how that system ought to be regulated or altered." *Id.* at 765, 96 S.Ct. at 1827. *See also Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 562, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980) (rejecting "the 'highly paternalistic' view that government has complete power to suppress or regulate commercial speech"), and *Bates v. State Bar of Arizona,* 433 U.S. 350, 383, 97 S.Ct. 2691, 2708–2709, 53 L.Ed.2d 810 (1977) (advertising by attorneys not subject to "blanket suppression," though false, deceptive, or misleading advertising may be suppressed).

We believe that *Wall Street Transcript* still states good law. Indeed, the Supreme Court has affirmed its essential rationale since its decision in *Virginia Pharmacy.* In *Ohralik v. Ohio State Bar Association,* for example, the Court stated that government "does not lose its power to regulate *commercial activity* deemed harmful to the public whenever speech is a component of that activity." 436 U.S. 447, 456, 98 S.Ct. 1912, 1919, 56 L.Ed.2d 444 (1978) (emphasis added). The Court noted

> [n]umerous examples ... of communication that are regulated without offending the First Amendment, such as the exchange of information about securities, *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (CA2 1968), cert. denied, 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed.2d 756] (1969), corporate proxy statements, *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 [90 S.Ct. 616, 24 L.Ed.2d 593] (1970), the exchange of price and production information among competitors, *American Column & Lumber Co. v. United States,* 257 U.S. 377 [42 S.Ct. 114, 66 L.Ed. 284] (1921), and employers' threats of retaliation for the labor activities of employees, *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618 [89 S.Ct. 1918, 1942, 23 L.Ed.2d 547] (1969).

*Id.* It concluded that "[n]either *Virginia Pharmacy* nor *Bates* purported to cast doubt on the permissibility of these kinds of commercial regulation." *Id. See also*

*NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Jay Norris, Inc. v. FTC,* 598 F.2d 1244, 1252 (2d Cir.1979), *cert. denied,* 444 U.S. 980, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979); and Note, *Peaceful Labor Picketing and the First Amendment,* 82 Colum.L.Rev. 1469, 1484–88 (1982). Thus, considered in light of *Virginia Pharmacy* and its progeny, we believe that the provisions of the Investment Advisers Act at issue here are precisely the kind of regulation of commercial activity permissible under the First Amendment. Accordingly, we believe that the holding of *Wall Street Transcript* controls this case.[5]

We find additional support for our conclusion in the Seventh Circuit's decision in *Savage v. Commodity Futures Trading Commission,* 548 F.2d 192 (7th Cir.1977) (opinion by Moore, J., of the Second Circuit, sitting by designation). Decided after *Virginia Pharmacy, Savage* nevertheless hewed to the *Curtis Publishing Co./Wall Street Transcript* viewpoint that a business is not immune from regulation merely because it is an agency of the press. *Id.* at 197. On facts closely analogous to those presented by this case, the court held that the publisher of the *Commodity Exchange Bulletin,* a newsletter containing views on the commodity market, was not entitled to registration under the Commodity Futures Trading Commission Act as a commodity trading adviser in view of his previous convictions for securities fraud and mail fraud arising out of the operations of a securities company.

The appellees would distinguish *Savage* on the basis that there the publisher erroneously argued that his commodities newsletter had only the limited protection of commercial speech. They contend that *Savage* was decided before the Supreme Court "clearly indicated" in *Central Hudson Gas* that commercial speech refers only to commercial advertising. They argue that under *Central Hudson Gas* "commercial speech" includes only direct product or service advertising and a seller's indirect or informational advertising. Since Lowe and his companies "do not sell investments [but] report and comment on the investments offered by others," the argument runs, newsletters are not commercial speech.

In our view, this argument is unconvincing. Unlike the Third Circuit in *Ad World, Inc. v. Township of Doylestown,* 672 F.2d 1136 (3rd Cir.1982), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 850 (1982), and the court below, we do not believe that the Supreme Court has limited commercial speech solely to product or service advertising. In *Bates v. State Bar of Arizona,* the Court said that "[i]f commercial speech is to be distinguished, 'it must be distinguished by its content,'" not its form, 433 U.S. 350, 363, 97 S.Ct. 2691, 2699, 53 L.Ed.2d 810 (1977) (quoting *Virginia Pharmacy,* 425 U.S. at 761, 96 S.Ct. at 1825). Although *Central Hudson Gas* stated that "[t]he First Amendment's concern for commercial speech is based on the informational function of advertising," 447 U.S. at 563, 100 S.Ct. at 2350, the Court did not define commercial speech in these terms. Rather it defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Id.* at 561, 100 S.Ct. at 2349. Similarly, in *Friedman v. Rogers,* the Court stated "[b]y definition, commercial speech is linked inextricably to commercial activity . . . ." 440 U.S. 1, 10 n. 9, 99 S.Ct. 887, 894 n. 9, 59 L.Ed.2d 100 (1979). *Cf. Bolger v. Youngs Drug Products Corp.,* —— U.S. ——, ——, n. 14, 103 S.Ct. 2875, 2880–2881, n. 14, 77 L.Ed.2d 469 (1983) (expressing "no opinion as to whether reference to any particular product or service is a necessary element of commercial speech"). These definitions do not limit commercial speech to advertising and are

---

**5.** This view necessarily leads us to reject the appellees' contention that the Act violates equal protection by subjecting investment newsletters, but not bona fide newsletters, to regulation. In holding that the publication of investment advice is regulable commercial activity, we necessarily hold also that such newsletters may be treated differently from other publications. This court previously reached the same conclusion in *Wall Street Transcript,* 422 F.2d at 1378–79.

broad enough to encompass Lowe's publications. Thus, although we think it preferable to analyze this case as one involving the permissible regulation of economic activity, we believe that the Investment Advisers Act withstands constitutional scrutiny under First Amendment doctrine relating to commercial speech as well.[6]

Lowe and his companies argue that in view of the fact that the Commission has never challenged any of the substantive material contained in any of their publications, it may not "rely on the mere possibility of future deception as a ground for the outright prohibition of the publications even under a commercial speech analysis." In essence, they charge the SEC with impermissible prior restraint. Whether we approach this case emphasizing its aspect of the regulation of a profession or view its principal thrust as pertaining to commercial speech, this argument is unavailing.

■ Before the SEC may revoke an adviser's registration, the Investment Advisers Act requires a finding of misconduct reflecting adversely on the honesty of the adviser, an essential attribute of a person entrusted to deal with intangible products which have numerous, intricate facets as securities do. *See* 15 U.S.C. § 80b–3(e)(2). The appellees rely on such cases as *Natco Theaters, Inc. v. Ratner,* 463 F.Supp. 1124 (S.D.N.Y.1979), in arguing that a finding of past misconduct may not serve as the basis for revoking an investment adviser's license. But the regulation of advisory publishers is properly compared, we believe, not to the licensing of theater operators, but rather to the licensing of professionals. *See, e.g., Ohralik v. Ohio State Bar Association,* 436 U.S. at 460, 98 S.Ct. at 1920–1921; *Watson v. Maryland,* 218 U.S. 173, 177–78, 30 S.Ct. 644, 646–647, 54 L.Ed. 987 (1910);

*Dent v. West Virginia,* 129 U.S. 114, 121–23, 9 S.Ct. 231, 233–234, 32 L.Ed. 623 (1889). The denial of a professional license for criminal conduct has been a traditional, and perhaps necessary, aspect of this type of regulation. *Barsky v. Board of Regents,* 347 U.S. 442, 451, 74 S.Ct. 650, 655, 98 L.Ed. 829 (1954); *Doe v. Webster,* 606 F.2d 1226, 1239 n. 51 (D.C.Cir.1979). Thus, we believe that the SEC may bar Lowe from the profession of investment adviser because of his past criminal conduct.

■ That commercial speech is involved leads to no different result. In *Friedman v. Rogers,* the Supreme Court found it irrelevant that the use of a trade name was "not in fact misleading" since it was a type of speech which "enhances the opportunity for misleading practices." 440 U.S. at 15, 99 S.Ct. at 897. As this court noted in *Jay Norris, Inc. v. FTC,* "[t]he prohibition in *Friedman* was a total ban on a business practice or form of advertising because of the *potential* for deception . . . ." 598 F.2d at 1252 (emphasis added). Just as the potential for deception may justify the regulation of a profession, *see, e.g., Ohralik,* 436 U.S. at 461–62, 98 S.Ct. at 1921–1922, so, too, the potential for deception permits government to ban potentially deceptive commercial speech. *See Friedman,* 440 U.S. at 15, 99 S.Ct. at 897; *Central Hudson Gas,* 447 U.S. at 563–64, 100 S.Ct. at 2350. In light of Lowe's history of deceptive, criminal conduct as an investment adviser, his publications may fairly be characterized as potentially deceptive commercial speech.

The appellees would have the SEC wait until Lowe had committed further violations of the securities laws and then somehow punish him while apparently permitting him to continue publishing. Such a

---

**6.** Recent Supreme Court decisions suggest that a similar "middle level" protection is appropriate for certain kinds of speech, for example, in cases of regulation of commercial advertising (*Virginia Pharmacy,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)); zoning of theaters which play "adult," but not obscene, films (*Young v. American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)); labor picketing regulation (*NLRB v. Retail Store Em-*

 *ployees Union, Local 1001,* 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980)); and the regulation of professions (*Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1977)). Thus, whether we view this case as one involving commercial speech or the regulation of the professions, the Investment Advisers Act does not conflict with the First Amendment.

remedy would hardly be effective redress for the affected public. The regulation of professions is intended to prevent harm to the public before it occurs, not after it is done. Saying that appellees may not sell their views as to the purchase, sale, or holding of certain securities is no different from saying that a disbarred lawyer may not sell legal advice. Thus, we hold that the authority to revoke Lowe's registration as an investment adviser, and as a result to bar him from publishing his newsletters, does not violate the First Amendment.

Finally, we note what this holding does not entail. Lowe is not prohibited from publishing or stating his views as to any matter of current interest, economic or otherwise, such as the likelihood of war, the trend in interest rates, whether the next election will affect market conditions, or whether future enforcement of the Anti-Dumping Act to protect basic American smokestack industry from foreign competition is likely. He is not prohibited from publishing a newspaper of general interest and circulation. Nor is he prohibited from publishing recommendations in somebody else's bona fide newspaper as an employee, editor, or writer. What he is prohibited from doing is selling to clients advice and counsel, analysis and reports as to the value of specific securities or as to the advisability of investing in, purchasing or selling or holding specific securities.[7]

Judgment reversed.

**VAN GRAAFEILAND, Circuit Judge, concurring:**

Although, ordinarily, I would be content simply to concur in Judge Oakes' thoughtful and well-reasoned opinion, the strong protest registered in Judge Brieant's dissent prompts me to pen this brief concurring opinion.

At the outset, I agree with Judge Oakes that, if a doctor must be licensed to write prescriptions and a lawyer to argue appeals, there is no reason why, in the public inter-

est, an investment adviser should not be required to register before he can give investment advice. Where the standard for the granting of a license is "public interest, convenience, or necessity," the denial of a license on that ground, if provided for by statute, is not a denial of free speech. *See National Broadcasting Co. v. United States,* 319 U.S. 190, 226–27, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943). It is now settled beyond dispute that, in performing its assigned duties, the SEC acts as a "statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir.1975). ·

Congress was sufficiently concerned about violations of the Investment Advisers Act that it provided severe criminal penalties for willful violations thereof. 15 U.S.C. § 80b–17. The fact that the prohibited acts involve speech does not make them any the less unlawful. "The use of a printed message to a bank teller requesting money coupled with a threat of violence, the placing of a false representation in a written contract, the forging of a check, and the false statement to a government official, are all familiar acts which constitute crimes despite the use of speech as an instrumentality for the commission thereof." *United States v. Barnett,* 667 F.2d 835, 842 (9th Cir.1982).

If the giving of investment advice by an unregistered investment adviser is unlawful, a court, after proper hearing, should be able to prohibit it, especially where the prohibited acts constitute a continuation of conduct already found to be unlawful. *See Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 496, 102 S.Ct. 1186 (1982); *Central Hudson Gas & Elec. Corp. v. P.S.C.,* 447 U.S. 557, 559, 563–64, 100 S.Ct. 2343, 2350 (1980); *Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations,* 413 U.S. 376, 389–90, 93 S.Ct. 2553, 2560–2561, 37 L.Ed.2d 669 (1973). A good illustration of the exercise of this

---

**7.** We leave to another day the question whether a publication dealing only with market indicators generally or making recommendations only as to groups of securities (e.g., air transport, beverages-brewers, mobile homes) could be barred on facts such as those of this case.

constitutional power can be found in the use of injunctions to restrain unlawful trade practices. *See National Soc. of Prof. Engineers v. United States,* 435 U.S. 679, 697, 98 S.Ct. 1355, 1368, 55 L.Ed.2d 637 (1978). As the Court said in *Lorain Journal Co. v. United States,* 342 U.S. 143, 156, 72 S.Ct. 181, 187–188, 96 L.Ed. 162 (1951), "Injunctive relief under § 4 of the Sherman Act is as appropriate a means of enforcing the Act against newspapers as it is against others." In short, if, as the dissent agrees, "Lowe may not practice as ... an investment adviser," he should not be permitted to give investment advice.

Judge Brieant's concern about the terms of the injunction to be issued by the district court is, I suggest, premature and fails to take into account the skill and ingenuity of Judge Brieant's colleagues in the district court. The activities of an investment adviser which Lowe unlawfully has been carrying on are described in 15 U.S.C. § 80b–2(a)(11). Although, as a general rule, a district court should not content itself with issuing an "obey the law" injunction, it quite properly may frame the injunction in terms of the specific statutory provision which the court concludes has been violated. *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1103 (2d Cir.1972); *United States v. Miller,* 588 F.2d 1256, 1261 (9th Cir.1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979). I have no doubt that, upon remand, the district court can frame an injunction so that Mr. Lowe "will know what the court intends to forbid."

BRIEANT, District Judge, dissenting:

I interpret the majority opinions as commanding the district court, without balancing the equities, to impose an injunction upon appellee Lowe and his affiliates which, at best, will be illusory and unenforceable, and at worst, constitutes a prior judicial restraint upon the publication of regularly issued journals of fact and opinion, "investment newsletters," therein described. Because I regard this prior restraint on publication as inappropriate; nei-

ther constitutional in light of the First Amendment; nor required by the Investment Advisers Act of 1940 ("the Act"); nor justified by our prior decisions; I respectfully dissent.

I

I agree that Lowe may not practice as, nor hold himself out to be, a registered investment adviser under the Act, nor may he engage in any fraudulent activity in connection with his publications. *Cf. SEC v. Capital Gains Research Inc.,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); *Courtland v. Walston & Co.,* 340 F.Supp. 1076 (S.D.N.Y.1972).

Lowe's investment newsletters, fairly described by the majority, are publications of the sort issued on a schedule, rather than timed for release attuned to specific market events. Delivered by mail, they are several days old when read, and convey the same facts and opinion to all readers. Typically such newsletters accept any subscriber who wishes to become such and is willing to pay the standard annual subscriber's fee. The expression of opinion by that means is poles apart from the traditional giving of investment advice; just as remote as a health care publication (*e.g.,* "Prevention Magazine") is from the practice of medicine, or a book advising how to avoid probate is remote from the practice of law. The latter require a medical or law degree and a license, while the former are protected First Amendment expression. *See New York County Lawyers Association v. Dacey,* 21 N.Y.2d 694, 287 N.Y.S.2d 422, 234 N.E.2d 459 *rev'g.,* 28 A.D.2d 161, 283 N.Y.S.2d 984 (1967); Elman, Commr., *dissenting* in *Rodale Press, Inc., et al. v. Federal Trade Comm.,* 71 F.T.C. 1184, 1247–1253 (1967), *quoted with approval* by Robinson, III, J., concurring in *Rodale Press, Inc. v. Federal Trade Commission,* 407 F.2d 1252, 1258 (D.C.Cir.1968).

An investor counseling with an adviser, directly, or by means of a telephone hotline, receives timely non-public advice, usually individualized, by which he hopes to gain an "edge" on others in the market. By reason

of its clandestine or confidential character, such advice is particularly susceptible to fraud or manipulation. However, the contents of a newspaper are public when published, and the counsel so given is immediately known to all, including the watchful eyes of the SEC.

## II

Discussion of the issue of so-called "commercial speech" by the majority is of great interest, but little assistance to the resolution of this case. In my view these newsletters are not "commercial speech," any more than our most respected daily newspaper is "commercial speech." Lowe is not selling securities or advertising investment advice; he is selling his publications themselves, and his editorial expression of the facts and opinions therein set forth. Like all publishers, Lowe charges subscription fees for his publications. I concede that the readers (subscribers) are seeking opinion and information to aid in their investment decisions, and Lowe intends this result.

When readers seek health information, they subscribe to health oriented publications, for spiritual advice they read religious tracts, and for astrology they read sidereal almanacs. Freedom of the press is not limited to the pamphleteer who hands out his tracts free of charge, nor is the right to write, and publish about investments without license limited to "bona fide publications of general and regular circulation," if those words found in the Act are to be read restrictively so as to exclude any paper eligible to be entered at the post office as second class mail matter. *See H.W. Wilson Co. v. United States Postal Service,* 438

F.Supp. 326 (S.D.N.Y.1977), *aff'd.* 580 F.2d 33 (2d Cir.1978) (construing prior statute).

With characteristic understatement, the court below termed "questionable" the SEC's contention that these publications constituted "commercial speech," 556 F.Supp. at 1366, and suggested that commercial speech is confined properly to instances of service or product advertising. On appeal, the SEC takes issue with this view, and the majority now rejects it as well, holding that commercial speech is sufficiently broad in scope to encompass the sale of a journal of fact and opinion to paid subscribers.

Our attention is directed to the several recent articulations of what constitutes "commercial speech," which are said to establish that "commercial speech" is not confined to advertising, but extends to all "expression related solely to the economic interest of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Service Comm.,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980). Consideration of the Supreme Court's attempts at redefinition since *Virginia Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) convinces me that the concept of commercial speech has now been confined to naked advertising and closely related methods of commercial solicitation. A fair consideration of recent Supreme Court learning suggests that *SEC v. Wall Street Transcript Corp.,* 422 F.2d 1371 (2d Cir. 1970), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970), relied on by the majority, is now as dead as Marley, and if not dead, readily distinguished.[1] Each

---

1. It must be noted that *Wall Street Transcript* was a "chilling" case, not a prior restraint case. When a contention is advanced that First Amendment rights are being chilled by official action, a Court is required only to balance the interest being served by the governmental action against the degree of chill. *See Waterfront Commission v. Local 1814, Longshoremen, etc.,* 667 F.2d 267 (2d Cir.1981).

   Similarly, *Savage v. Commodities Futures Trading Commission,* 548 F.2d 192 (7th Cir. 1977) relied on by the majority, is distinguishable. In *Savage,* Judge Moore was concerned

only with the question of whether the Commission's order refusing petitioner's registration as a commodity trading adviser should be reversed. Although petitioner so argued, prior restraint of the press was not an issue in that case. The gist of *Savage* may be found in the comment by the Court that:

> "[I]t has long been recognized that the [First] Amendment does not remove a business engaged in the communication of information from general laws regulating business practices." Citing *Curtis Publishing Co. v. Butts,*

recent Supreme Court commercial speech case has arisen in the context of service or product *advertising.* Thus, in addition to the ban on advertising by pharmacists, considered in *Virginia Pharmacy, supra,* the Court has addressed restrictions on attorney advertising and solicitation [*Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978); *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); *Matter of R.M.J.,* 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982)]; a ban on the use of "For Sale" signs by sellers of residential property [*Linmark Associates Inc. v. Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977)]; restrictions on the use of trade names by optometrists [*Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979)]; a ban on advertising by a public utility [*Central Hudson Gas, supra*]; and, most recently, a federal statutory restriction on advertising mixed with expressions of opinion by manufacturers of prophylactics [*Bolger v. Youngs Drug Products Corp.,* —— U.S. ——, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)]. See also *Metromedia Inc. v. San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (restrictions on commercial and non-commercial billboard advertising).

That each of the cases in which the Court has sought to clarify the "commercial speech" doctrine has arisen in the context of attempts to regulate or prohibit advertising, while significant, does not, standing alone, demonstrate conclusively that commercial speech is restricted to advertising and equivalent economic promotional activities. However, examination of the characteristics of commercial speech which have caused the Supreme Court to accord to it a lesser degree of First Amendment protection demonstrate that since 1976 all speech so considered has been inextricably intertwined with advertising. Thus, in *Virginia*

*Pharmacy Board, supra,* reference to commercial speech is in the context of a discussion of advertising, and the interests of both the advertiser and the consumer in the flow of commercial information. Support for the argument that commercial speech essentially comprises some sort of advertising or equivalent economic promotional activity is also found in *Central Hudson Gas, supra,* in which the Court invalidated a New York State regulation prohibiting the promotion of electricity consumption through advertising. The Court in that case addressed the interests served by commercial expression: "In applying the First Amendment to this area, we have rejected the 'highly paternalistic' view that government has the complete power to suppress or regulate commercial speech .... Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all." 447 U.S. at 562, 100 S.Ct. at 2350 (citations omitted). Significantly, the Court in *Central Hudson Gas* states that the very basis of the First Amendment's concern for commercial speech is the "*informational function of advertising.*" *Id.* at 563, 100 S.Ct. at 2350, emphasis added.

Of greatest interest, probably because it is most recent, is *Bolger v. Youngs Drug Products Corp., supra,* where the Court unanimously invalidated a Postal Service prohibition of unsolicited mailings, one of which conveyed "truthful information relevant to important social issues such as family planning and the prevention of venereal disease." (Marshall, J. —— U.S. at ——, 103 S.Ct. at 2882). The Court noted that some content-based restrictions on commercial speech are justified in light of the "greater potential for deception or confusion in the context of certain advertising messages" (at ——, 103 S.Ct. at 2879), but also held that "the mere fact that these pamphlets are conceded to be advertise-

388 U.S. 130, 150, 87 S.Ct. 1975, 1989, 18 L.Ed.2d 1094 (1967).

I agree so long as prior restraint on publication is not involved. But see, *SEC v. Blavin,* 557 F.Supp. 1304, 1310 (E.D.Mich.1983) in

which, in addition to protecting the right to publish, the Court required the SEC to grant defendant registration as an investment adviser.

ments clearly does not compel the conclusion that they are commercial speech," citing *New York Times v. Sullivan,* 376 U.S. 254, 265–66, 84 S.Ct. 710, 718–719, 11 L.Ed.2d 686 (1964), *id.* —— U.S. at ——, 103 S.Ct. at 2880.[2]

I conclude that in the wake of *Bolger,* commercial speech which goes beyond mere advertising, so as to include expression of fact and opinion implicating (as does an investment newsletter or a health newsletter, or even a racetrack tout sheet), "substantial individual and societal interests" (*id.* at ——, 103 S.Ct. at 2881), now enjoys full First Amendment protection, at least insofar as prior restraint is concerned. In short, even if these newsletters were commercial speech, which they are not; I believe they would be entitled to full First Amendment protection from prior restraint. As Justice Rehnquist, concurring in *Bolger* observed, "the First Amendment, which was designed to prevent the government from suppressing information, requires us 'to assume that this information is not in itself harmful, that people will perceive their own interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them,' [citation omitted]." *Id.* at ——, 103 S.Ct. at 2887.

In explaining why commercial speech should be entitled to a lesser degree of First Amendment protection than other communication, the Court, both in *Virginia Pharmacy Board* and *Central Hudson Gas, supra,* relied on two aspects of commercial speech which set it apart:

"First, commercial speakers have extensive knowledge of *both* the market *and their products.* Thus, they are well situated to evaluate the accuracy of their messages and the unlawfulness of the underlying activity. In addition, commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not particularly susceptible to being crushed by overbroad regulation." *Central Hudson Gas,* 447 U.S. at 564, n. 6, 100 S.Ct. at 2350, n. 6, citations omitted, emphasis added. *See also Virginia Pharmacy,* 425 U.S. at 771–72, n. 24, 96 S.Ct. at 1830, n. 24.

The difference between such "commercial speakers" mentioned in *Central Hudson Gas* and Lowe are readily apparent. The publishers here are not selling their own investments, nor are they urging their subscribers to invest in a business in which the defendants have a financial stake. Lowe's publications do not comment about *his own products;* they analyze and evaluate the securities offered by third parties. In this respect, the investment newsletters do not differ in principle from well-known periodicals such as *Barron's, Forbes,* or *Consumer Reports.* Presumably, the majority would not contend that insofar as these publications of general circulation perform a similar function, they would become subject to similar licensure or prior restraint.

In addition to linking advertising to commercial speech, the Court in *Virginia Pharmacy* reiterated an earlier definition of commercial speech as expression which does "*no more than* propose a commercial transaction." *Id.* at 762, 96 S.Ct. at 1825, quoting *Pittsburgh Press Co. v. Human Relations Commission,* 413 U.S. 376, 385, 93 S.Ct. 2553, 2558–2559, 37 L.Ed.2d 669 (1973) (emphasis added). Enough has been said concerning the contents of the Lowe newsletters to demonstrate that they do more than "propose commercial transactions."

Finding commercial speech to be "squarely" presented in *Virginia Pharmacy Board,* the Court stated that this was because the pharmacist challenging the Commonwealth's restrictions on his advertising:

---

**2.** One of the pamphlets in *Bolger* purported to be an expression of fact and opinion rather than an advertisement. In an inconspicuous place, it bore the self-serving statement that it was "contributed as a public service" by Youngs Drug Products Corp. See n. 4, *Bolger, supra,* at ——, 103 S.Ct. at 2879. There is no bright line by which an advertisement can be distinguished on its face from a statement of fact and opinion *actually* presented as a public service by a commercial enterprise. Nor is there any reason to believe that a corporation has less First Amendment rights than an individual.

"does not wish to editorialize on any subject, cultural, philosophical or political. He does not wish to report any particularly newsworthy fact, or to make generalized observations even about commercial matters. The 'idea' he wishes to communicate is simply this: 'I will sell you X prescription drug at the Y price.' " 425 U.S. at 761, 96 S.Ct. at 1825.

Here, in contrast, the appellees *do* seek to report "newsworthy facts" and make "generalized observations" about economic and financial conditions as well as recommending stocks and issuers, the latter inextricably entwined with the former.

We address here not the power to regulate, or punish fraud after publication, but the power to impose prior restraint. Investment opinion, in my opinion, is as much speech protected from prior restraint as is political opinion, philosophy or gibberish. Not only for the Zengers, the Patrick Henrys and the Ellsbergs was this basic freedom secured, but also for an ex-convict whom the majority assumes to be motivated towards recidivism.

A judicial system which will not enjoin a libel [*Brandreth v. Lance,* 8 Paige Ch. 24 (N.Y.1839)], and will not enjoin publication of the Pentagon Papers [*New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d. 822 (1971)], should not countenance a prior restraint on publication of a regularly issued newsletter containing fact and investment opinion. Even if Lowe's publications constitute commercial speech, the prior restraint sought to be imposed is unconstitutional. In *Central Hudson Gas, supra,* the Court held that restraints will be upheld only if "the regulation directly advances the governmental interest asserted," and "it is not more extensive than is necessary to serve that interest." 447 U.S. at 566, 100 S.Ct. at 2351. These restraints do not qualify. See *infra,* p. 909.

Any prior restraint comes to Court with a "heavy presumption against its constitu-

tional validity." *Bantam Books v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). This results from the devastating impact prior restraints have on the exercise of First Amendment rights, far exceeding a mere "chill":

> "Prior restraints fall on speech with a brutality and a finality all their own. Even if they are ultimately lifted they cause irremediable loss—a loss in the immediacy, the impact, of speech. They differ from the imposition of criminal liability in significant procedural respects as well, which in turn have their substantive consequences. The violator of a prior restraint may be assured of being held in contempt; the violator of a statute punishing speech criminally knows that he will go before a jury, and may be willing to take his chance, counting on a possible acquittal. A prior restraint, therefore, stops more speech more effectively. A criminal statute chills, prior restraint freezes. Indeed it is the hypothesis of the First Amendment that injury is inflicted on our society when we stifle the immediacy of speech." Bickel, *The Morality of Consent,* 61 (1975), quoted with approval in *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2802–2803, 49 L.Ed.2d 683 (1976).

Because of this devastating effect on freedom of speech, previous restraints will be upheld only in "exceptional" cases, *e.g.,* the "threat of a grave and immediate danger to the security of the United States," *United States v. New York Times Co.,* 444 F.2d 544 (2d Cir.1971), *rev'd on other grounds,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822; see also Brennan, J. concurring in *New York Times, supra,* 403 U.S. at 726, 91 S.Ct. at 2147.[3]

### III

To affirm the trial court here, it is not necessary, in my view, to hold that the Act is facially unconstitutional as a press licensing scheme. Certainly it was not so intended; Congress understood about the First

---

**3.** There is no clear and present danger shown to the national security which would justify such an injunction. The majority apparently assumes that because of his criminal record and allegedly bad character, Lowe is more likely to publish false ideas than are others, but not if he is working for somebody else's paper. This is illusion, and threatens disaster.

Amendment. Its legislative product should not lightly be construed as intended to effect an unconstitutional result nor to impose an undue or useless degree of regulation upon a constitutionally protected activity. However, if the provision of the Act which exempts a "bona fide [publication] of general and regular circulation," found at 15 U.S.C. § 80b–2(a)(11) (1976), is to be read as literally and narrowly as the majority would have it, this means to me that some judge, at the instance of the SEC, will be called upon to adjudicate the *bona fide vel male fide* of a newspaper, to determine if it is to be subject to prior restraint should it contain investment opinion or "recommend" a security. This leaves a dangerous editorial evaluation in hands not to be trusted with such a decision, and requires a determination for which no satisfactory objective standard is provided. We have held "Courts should be chary of deciding what is and what is not news" [Meskill, J. dissenting in *Harper & Row Publishers Inc. v. Nation Enterprises,* 723 F.2d 195, at 215 (2d Cir.1983), a view adopted by majority op. at 194]. I suggest we must be even more chary in undertaking to determine when or whether a publication is "bona fide," unless such words are regarded as broad enough to comprise *all* regularly issued publications containing fact and opinion and available to all who would subscribe, as Lowe's newsletters are.

The Act, as construed by the majority seems both under and over inclusive. In theory, Lowe's entire expression of views could appear in our favorite local newspaper without official hindrance. Suppose following remand, Lowe should transfer stock ownership of his corporations to a friend and add to his newsletters a tidetable, a list of ship arrivals, Ann Landers, a crossword puzzle and selections reprinted from *Areopagitica?* Would his newsletters now be *bona fide* newspapers, in the eyes of the majority? I submit that on First Amendment and prudential grounds a decision that they would not be is beyond the power of any court to make. In short, I do not question the power of government to license lawyers, doctors, accountants, registered representatives employed by stockbrokers and those giving individualized investment advice or holding themselves out as investment advisers, and similar professionals. However, the right to licensure, and the concomitant power to restrict entry into the licensed occupation, does not in America extend to writers or publishers.

Licensing of the press was abandoned in England in 1694, but the memories of this imposition upon the natural rights of man lingered sufficiently to lead to the enactment of the First Amendment almost a century later. An intention to disregard this vital Constitutional imperative should not lightly be imputed to Congress.

I would construe the Act essentially as did the court below. In this connection, I am puzzled by the provision in the majority opinion (At 902), which provides that Lowe is "not prohibited from publishing a newspaper of general interest and circulation, nor is he prohibited from publishing [investment] recommendations in *somebody else's bona fide* newspaper as an employee, editor or writer." (Emphasis added).

I fail to see how it can be adjudged that Lowe can exercise his First Amendment protected expressions as to investments, but only so long as he is not himself the owner or proprietor of the publication in which his views appear. Such a distinction must assume that the owner or proprietor of a *bona fide* newspaper will exercise some control over Lowe's writings so as to prevent fraud. There is no assurance that this would be so. And I am appalled by the thought that in order to enforce the injunction to be granted on remand, the trial court may be required to snoop into the corporate records of a publication to find out whether it is directly or indirectly owned by Lowe, in order to make the adjudication as to whether or not it is *"somebody else's* bona fide newspaper." A court of equity should not utter an injunction which might give rise to such intrusions in a First Amendment protected area such as a newspaper office.

## IV

There are prudential reasons apart from the Constitutional issues heretofore discussed, which militate against the granting

of injunctive relief in the form directed by the majority.

I cannot express a better description of a typical investment newsletter than that found in the majority opinion; whether in recommending specific stocks or predicting near and long term market trends, Lowe, and the typical investment newsletter writer is in effect "publishing or stating his views as to any matter of current interest, economic or otherwise, such as the likelihood of war, the trend in interest rates, whether the next election will affect market conditions, or whether future enforcement of the Anti-Dumping Act to protect basic American smokestack industry from foreign competition is likely." (Majority at 902). Yet that is what the majority says Lowe is *not*, on remand, to be prohibited from doing. He will become a criminal contemnor if, but only if, he writes and publishes "as to the value of specific securities or as to the advisability of investing in, purchasing or selling or holding specific securities." (At 902). While footnote 7 of the opinion purports to reserve decision (*i.e.*, "leave to another day") as to whether Lowe may publish "dealing with market indicators generally," and "making recommendations only as to groups of securities," (at 902, n. 7), no logical basis is presented for the court on remand to allow the recommendation of groups of securities but not individual stocks. Faced with the necessity of framing an injunction which preserves Lowe's conceded right to express his views as to the effect of current events on market conditions, and yet prevents any "recommendation" of specific securities, the district judge will be confronted with extreme difficulty. The injunctive decree of a court of equity must be intelligible and practical; it must draw a bright line, and should produce benefits at least equal to its social burdens. Equity requires that those enjoined receive "explicit notice of precisely what conduct is allowed." *Schmidt v. Lessard*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). In *Diapulse Corp. of America v. Carba Ltd.*, 626 F.2d 1108, 1111 (2d Cir. 1980) we held, per Judge Van Graafeiland:

> "A court is required to frame its orders so that those who must obey them will know

what the Court intends to forbid . . . . It is for this reason that Fed.R.Civ.P. 65(d), like its predecessor, provides that every order granting an injunction shall be specific in terms and describe in reasonable detail the acts sought to be restrained. An order which does not satisfy the requirement of specificity and definiteness will not withstand appellate scrutiny."

*See also, United States v. Charmer Industries, Inc.*, 722 F.2d 1073 (2d Cir.1983) (*Charmer II*) *Schurr v. Austin Galleries of Illinois, Inc.*, 719 F.2d 571 (2d Cir.1983) (Van Graafeiland, J. concurring).

This requirement is especially important where First Amendment freedoms are implicated. *Organization For a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). The injunction which the majority commands cannot be framed in compliance with the directions given, so as to insure that constitutionally protected expression will not be stifled, along with the investment advice on specific issues which the Court finds Lowe may no longer express.

In a case involving an attempt to enjoin the showing of motion pictures, the Fifth Circuit noted the difficulty inherent in attempting to enjoin future expression on the basis of unprotected past conduct, where a statute permitted the closing for one year of any theatre which had exhibited an obscene film:

> "Thus, [under the statute] future conduct that may fall within the purview of the first amendment is absolutely prohibited after a finding of unprotected present conduct. It was precisely this practice that was condemned by the Supreme Court in the landmark case of *Near v. Minnesota*." *Universal Amusement Co., Inc. v. Vance*, 587 F.2d 159, 165 (5th Cir. 1978).

While stated in the context of an attempt to prevent obscenity, the Fifth Circuit's reasoning is applicable to this case as well. In light of the difficulty of framing an injunction which would prevent Lowe from recommending specific securities, while at the same time preserving his right to comment

on "any matter of current interest," any injunction issued will have the effect of stifling constitutionally protected expression, thus amounting to an impermissible prior restraint on publications which have not yet been found to constitute "investment advice." *Cf. Universal Amusement Co., Inc., supra* at 169. Lowe's difficulty in knowing what will violate the terms of an injunction formulated according to this Court's directive will result in "self-censorship, a particularly subtle and most insidious form of the malady" of prior restraint. *Universal Amusement Co., Inc., supra* at 166.

Probably, following remand, this articulate litigant will demonstrate what a panel of this Court has previously described as an "ability to improvise and [a] flair for the creative" and bring about the same difficulty encountered when, in response to an overly broad injunction, oenologist Walter S. Taylor began to refer to himself as "Walter S. Xxxxxx," and depict himself on his wine bottles in a "Lone Ranger" type mask. *See Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.,* 590 F.2d 701, 702–03 (2d Cir.1978).

Injunctions which are unclear or easily set at naught should not be issued in the first place. There exists already more than adequate statutory protection, both penal and civil, against mail fraud, wire fraud, securities fraud and breach of fiduciary duty in writing about investments. An injunction of this sort, particularly because of its illusory character, will add little to the protection of the public. This is especially true in this case because the majority will apparently allow Lowe to express his opinions freely and without limitation "in somebody else's bona fide newspaper as an employee, editor, or writer" (At 902).

Any balancing of the equities, essential before any injunction is granted, should weigh the benefit to the public (nil in this case because of the injunction's vague, subjective and illusory nature) against the bur-

dens on those enjoined, severe in this case because free expression may be enjoyed only at great personal risk to Lowe, or his potential news publishing employers who might have to prove they are *bona fide* and not indirectly owned by Lowe.

This is not to mention the impossible burden of enforcement imposed on the district court.[4]

And for what is all this great effort? I agree with Chief Judge Weinstein below that "the censorship that the SEC would impose on Lowe is more extreme than necessary to effectuate the congressional goal of a confident and informed investing public," (556 F.Supp. at 1366) and therefore a balancing of the equities requires that no injunction issue.

Essentially for the foregoing reasons, as well as those expressed by Chief Judge Weinstein in his opinion below, I believe that the judgment appealed from should be affirmed.

---

**4.** There are probably a thousand and one ways to recommend a specific stock without using the word "recommend." Any puff piece published to investors about a business or an industry in effect "recommends" the stock there-

of. The court below following remand would seem to be at a loss to determine whether a contempt has been committed, or not, so long as the evil word "recommend" is not used.