**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**v.**

**WALL STREET PUBLISHING INSTITUTE, INC., Defendant.**

**Civ. A. No. 82–2000.**

United States District Court, District of Columbia.

July 12, 1984.

1072

Joseph H. Sharlitt, Washington, D.C., for defendant.

Linda B. Bridgman, Jay B. Dorsey, Washington, D.C., for plaintiff.

## MEMORANDUM OPINION

AUBREY E. ROBINSON, Jr., Chief Judge.

Plaintiff, the Securities and Exchange Commission, brings this action against Defendant, Wall Street Publishing Institute, Inc., alleging that it has been operating as an unregistered investment adviser and engaging in certain fraudulent practices relating to material misrepresentations published in "Stock Market Magazine" from January 1977 to July 1982. Plaintiff seeks an injunction restraining Defendant from further violations of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–3, 80b–6, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and § 17(b) of the Securities Act of 1933, 15 U.S.C. § 77q(b).

Presently before the Court are cross-motions for summary judgment. Plaintiff moves for summary judgment on each of the five counts contained in the complaint. Defendant also moves for summary judgment contending that it is not an investment adviser within the meaning of the

Act. It contends further that if the Court finds that it is not an investment adviser, judgment must also be entered for Defendant on counts two through four. With respect to count five, Defendant contends that there are genuine issues of material fact and therefore, summary judgment is inappropriate. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is granted and Defendant's Motion for Summary Judgment is denied.

*The Investment Advisers Act of 1940*

The Investment Advisers Act of 1940, 15 U.S.C. § 80b–3(a), makes it unlawful for any investment adviser, unless registered under the Act, to make use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser. The Act defines an investment adviser as:

> any person who for compensation, engages in the business of advising others either directly or through publications or writing, as to the value of securities or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as part of a regular business, issues or promulgates, analyses or reports concerning securities;
> . . . .

15 U.S.C. § 80b–2(a)(11). The Act excludes from the definition of investment adviser "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation." 15 U.S.C. § 80b–2(a)(11)(D).

Count I of Plaintiff's complaint alleges that Defendant is in violation of § 80b–3(a) of the Investment Advisers Act because it has used means or instrumentalities of interstate commerce in connection with its operation as an unregistered investment adviser. Plaintiff moves for summary judgment on this count contending that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law with respect to the issue of whether Defendant is an investment adviser and therefore, required to register under the Act.

Defendant also moves for summary judgment on Count I of the complaint contending that it is not an investment adviser within the meaning of the Act. According to Defendant, Stock Market Magazine is a "bona fide business or financial publication of general and regular circulation." Defendant contends further that the SEC has acted unconstitutionally in denying Defendant status within the exclusion.

The following material facts are not in dispute. Defendant is the publisher of a monthly magazine entitled "Stock Market Magazine." Stock Market Magazine is not registered with the SEC as an investment adviser. During the period of this law suit Defendant has been wholly owned and operated by Angelo R. Martinelli. Martinelli has delegated total responsibility regarding the editorial-side of Stock Market Magazine, that is, the management and content of the magazine, to Bernard D. Brown, Editor. During the period of this law suit, Brown has performed all editorial functions for Stock Market Magazine. His duties as Managing Editor include selection, placement and editing of six-to-eight feature stories and approximately five columns published in Stock Market Magazine per issue. He also writes three columns and responds to reader inquiries. As Acting Publisher he is responsible for business inquiries and decisions and maintains overall supervision for circulation and advertising.

Brown handles all editing of copy published in Stock Market Magazine. He edits the draft articles received from feature companies, public relations firms, and contributing editors for such things as typesetting, grammar, spelling, and space requirements. He also writes the story captions and headlines.

In addition to Brown, Defendant identified as Stock Market Magazine personnel a list of six "contributing editors." All of these "contributing editors" have either (a) been employed by public relations firms for whom they write company feature stories published in Stock Market Magazine, or (b) free-lanced company feature stories directly from the companies or public relations

firms for publication in Stock Market Magazine. Editors Brennan and Gropman are employees of public relations firms for whose clients they write stories. Brown also occasionally free-lances company stories for publication in Stock Market Magazine. When an individual free-lances a company story, he writes the story for publication in Stock Market Magazine and in turn receives a fee from the company's public relations firm. None of the contributing editors is registered with the SEC as an investment adviser.

Stock Market Magazine's total revenues are based on subscriptions, newsstand sales, sale of reprints, advertising, and rental of its mailing list. Stock Market Magazine is currently delivered to approximately 12,000 paid subscribers and has some newsstand sales. The subscription price for Stock Market Magazine is $15.00 per year. An individual issue sells for $1.50.

In 1977, a major portion of Defendant's total revenue was based on the sale of feature article reprints and advertising to the featured companies. Some of the public relations agents of the featured companies as well as some of Defendant's contributing editors testified during depositions that there was a generally understood *quid pro quo* arrangement whereby the company or its agent agrees to purchase reprints of the company feature article for publication in Stock Market Magazine. Further, according to Brown, the featured companies purchase ads for publication in Stock Market Magazine at the rate of $250 to $960 because they are "so grateful at having obtained exposure through favorable stories in the magazine."

Until April 1983, the following objective of Stock Market Magazine appeared in its masthead: "The Stock Market Magazine is published to inform the individual investor at every economic level." The masthead further noted that "feature articles are based on thorough research and first-hand interviews with company officials, economists, security analysts, tax accountants and other experts. Comments from readers are welcomed."

Brown admits, however, that in some instances he conducted no interviews regarding the article drafts supplied by the featured companies, their public relations agents, and the contributing editors other than to telephone company officials to verify company figures. He also admits that in some instances he conducted no research for these articles other than to check the annual report and other background material supplied by the featured company. In many instances, Stock Market Magazine publishes the drafts received from the featured companies or public relations firms verbatim. In deposition, Brown stated that he assumes the public relations firm or contributing editor does the research and interviewing described in the masthead.

According to Brown the purpose of the masthead statement is to reassure Stock Market Magazine readers that its feature stories are authentic, objective and in keeping with high standards of journalism. Prior to July 1980 the masthead also stated that its objective was "to help him [the investor] to make intelligent investment decisions." Until April 1983 the masthead also announced the magazine as the "Voice of the Small Investor."

Stock Market Magazine is 36 pages in length. Articles in each issue are characterized as "Features" or "Departments." There are usually six-to-eight feature stories and eight-to-nine departments. Interspersed among the features and departments to fill out page space are general news items and ads.

During the period covered by this action, the following columns have appeared regularly as "Departments" in Stock Market Magazine: The Wall Street Scene, Green Chips, Low Priced Stock of the Month, Technical Viewpoint, Market Mirror, Ray Dirks on Stocks, and Off Wall Street. According to Brown all of these columns give (a) advice and/or recommendations regarding the value of certain securities; (b) advice and/or recommendations as to the advisability of investing in certain securities,

and (c) an analysis of certain stocks and the market in general. The feature articles in each issue of Stock Market Magazine consist of (a) specific company features devoted to a single publicly held company, (b) general features devoted to a number of publicly held companies in an industry or to general investment information and (c) guest articles. Many of the feature stories published profiling specific companies are written and supplied by the companies or their public relations agents.

In a subscriber profile published in 1982, Stock Market Magazine described its readers as follows: all but 2% own securities, 70% own over $15,000 and 44% own over $25,000 in securities, 97% own common stock, and 34% are aged 45-to-65. Readers have responded to Stock Market Magazine's invitation to write to its editor for more personalized information regarding the stock market in some instances. Some readers also have expressed their displeasure at the tardiness of Stock Market Magazine recommendations due to the late arrival of the magazine. In response to this complaint, Brown advises readers that because "time is of the essence" in order for many of Stock Market Magazine articles and stock suggestions to be "helpful" for reader investment decisions, a subscription at first-class mail rates should be purchased.

Defendant promotes the sale and advertising of Stock Market Magazine through its "Best Picks" column, renewal letters, published advertisements, direct mail campaigns, press releases and unsolicited newspaper publicity. All of these promotion gimmicks tout Stock Market Magazine as a reliable investment guide to investors. For instance, the "Best Picks" column lists 10-to-15 stocks selected by Brown as the best performers of the approximately 50 company stocks analyzed in Stock Market Magazine feature articles during the prior year. The purpose of the list, according to Brown, was to promote Stock Market Magazine to new subscribers, to emphasize to "readers what they are getting from Stock Market Magazine, why they should be reading the magazine." He further noted

that the column "merely tells the reader what companies were analyzed, reviewed, written about, in the Stock Market Magazine."

Similarly, renewal letters sent to expiring subscribers promote Stock Market Magazine as a reliable investment guide and encourage subscribers to renew based on the money they can make by following its advice. The following is an example of language found in a renewal letter:

> Would you pay 89¢ per month for information from proven and respected authorities on the stock market? .... SMM brings you first-hand reports on the nation's most successful small and medium-sized companies and regular columns.... Other newsletters charge from $150 to as much as $2,000 for what purports to be similar information.... Our overall batting average in forecasts of market behavior is impressively high .... the value to you will more than justify your modest investment.

An appeal to the "investor" is also made in Defendant's published advertisements, direct mail campaigns and newspaper publicity.

■ Given these undisputed material facts, it is clear that Defendant meets the definitional elements of adviser status found in § 80b–2(a)(11) of the Act, *i.e.* compensation, business and publication. Defendant engages in the business of publishing Stock Market Magazine on a monthly basis. It receives compensation from the sale of Stock Market Magazine at a subscription rate of $15.00/year to approximately 15,000 subscribers. Its contributing editors have also received fees from public relations firms for writing feature company stories. It has limited newsstand sales and also receives consideration from the sale of advertising and reprints of Stock Market Magazine.

The only pivotal question left, therefore, is whether, in conjunction with the foregoing elements, Defendant gives advice as to the value of securities or as to the advisability of investing in securities, or issues or

promulgates analyses or reports concerning securities.

Defendant's publication on its face suggests that it provides advice as to the value or advisability of investing in securities. Until April 1983, after this action had been filed and pending for nine months, the title page proclaimed Stock Market Magazine as the "Voice of the Small Investor." Until July 1980, after Plaintiff first notified Defendant to register, its masthead claimed to provide information to the small investor to assist him "to make intelligent investment decisions."

Brown also admits that the Stock Market Magazine columns give advice and/or specific recommendations regarding the value or advisability of investing in securities. A review of the magazine compels such an admission. Allan Marshall's "Green Chips" and Jerry Kass' "Low Priced Stock of the Month" columns analyze and recommend stocks selling at less than $25.00. Dr. Goldstein analyzes, recommends and reviews prior recommendations for approximately 12 New York Stock Exchange Securities in his monthly column "Market Mirror." Grossman's "Off Wall Street Column" analyzes and recommends stocks identified by regional brokers. Dirks' column "Ray Dirks on Stocks" gives pointers on investments in common stocks and the new issues market and insurance stocks.

█ Given the above facts, it is clear that Defendant gives advice as to the value or advisability of investing in securities. However, even were Defendant not clearly giving advice as to the value or advisability of investing in securities, it meets the second prong of the definition of investment adviser. The second prong defines an investment adviser as any person who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

█ Initially, a review of the feature articles and columns devoted to specific publicly held company securities leads to the swift conclusion that these articles constitute analyses or reports concerning securities. A recent SEC no-action letter indicates the type of information not contemplated by the SEC to be included within the second prong of the definition of investment adviser:

> It is our view that a provider of information relating to securities will be deemed neither to furnish investment advice nor to issue or promulgate an analyses or report concerning securities when the information provided is readily available in its raw state, the categories of information are not highly selective, and the information provided is not organized or presented in a manner which suggests the purchase, holding, or sale of any security or securities.

*Jack Sonner,* (pub. avail. March 11, 1983). Defendant's specific company articles and columns profiling specific companies are by their very nature highly selective because they focus on a single company only. Finally, the information presented regarding earnings, stock dividends and price range is presented and organized in such a fashion to suggest purchase of the company security.

The Investment Advisers Act exempts from registration certain investment advisers. Defendant in this action relies on the exemption found in § 80b–2(a)(11)(D) which exempts from registration "a bona fide newspaper, news magazine, or business and financial publication of general and regular circulation." Defendant argues that the SEC has acted unconstitutionally in denying it status within the exclusion because the language of the exclusion on its face provides inadequate standards and the SEC has not promulgated any regulations or guidelines to govern its determination of a publication's status under the exclusion.

█ Initially, it is important to note that Defendant has the burden of proving that it falls within the exclusion. *SEC v. Wall Street Transcript Corp.,* 454 F.Supp. 559, 566 (S.D.N.Y.1978). It is well-established under both the Securities Act of 1933 and the Securities Exchange Act of 1934 that the burden of proving entitlement to

an exception should properly fall on the claimant thereof because "public policy strongly supports registration." *Quinn & Co. v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2059, 32 L.Ed.2d 344 (1972).

The case law construing the "bona fide newspaper, news magazine, or business and financial publication" exclusion is sparse. The leading case is *Wall Street Transcript Corp.*, 422 F.2d 1371 (2d Cir.), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970). In that case, the Court stated that a "bona fide newspaper includes those publications which do not deviate from customary newspaper activities to such an extent that there is a likelihood that the wrongdoing which the Act was designed to prevent has occurred." *Id.* at 1377. The Court further noted that the determination of whether or not a publication is within the "bona fide newspaper" exclusion must turn on the nature of its practices rather than upon the purely formal "indicia of a newspaper" which it exhibits on its face and in the size and nature of its subscription list. *Id.*

The *Wall Street Transcript* case arose in the context of a petition by the Securities and Exchange Commission for enforcement of a *subpoena duces tecum* issued pursuant to an investigation under the Investment Advisers Act. In reversing and remanding the decision of the trial court to deny the petition, the court pointed to several factors which would be pertinent in deciding whether the publication fits within the "bona fide newspaper" exclusion: (1) whether most of its published material consists of reprinted reports assessing various securities issues; (2) whether the publication places emphasis on particular issues and companies; (3) whether the publication is compensated by brokerage houses whose reports it publishes; (4) whether the publication alone determines the location of the articles that it publishes on the basis of its editor's news judgment alone; and (5) whether the articles are offered as investment advice. *Wall Street Transcript Corp.*, 422 F.2d at 1377–78. "What matters is whether or not a specific publication

is engaged in practices which the Act was intended to regulate, such as the offering of professional investment advice without revealing the possibility of personal gain to the publisher from what he reports or how he presents it." *Id.* at 1378.

In *SEC v. Wall Street Transcript Corp.*, 454 F.Supp. 559 (S.D.N.Y.1978), the action which was brought by the SEC subsequent to the subpoena enforcement proceeding discussed above, the court found that Defendant could avail itself of the statutory exclusion for "bona fide newspapers." The Court found the following factors important to its decision: (1) a large percentage of each publication was devoted to the reproduction of brokerage house reports or speeches given by financial analysts, either verbatim or in summary form; (2) defendants never received any compensation from any party for publishing or positioning a report or speech; (3) defendants never published any item for the purpose of affecting any security; (4) defendants never traded in any of the securities mentioned in the publication; and (5) the sole determination of what material was published in the publication was the editor's independent judgment as to newsworthiness within the limitations of space. *Wall Street Transcript Corp.*, 454 F.Supp. at 566–67. The court concluded that given these facts, it was "clear that Defendants do not engage in practices which the Investment Advisers Act was intended to regulate and that they may avail themselves of the statutory exclusion in § 202(a)(11)(D)." *Id.* at 567.

In *Person v. New York Post Corp.*, 427 F.Supp. 1297 (E.D.N.Y.), *affirmed without opposition*, 573 F.2d 1294 (2d Cir.1977), one of the other few cases to construe the "bona fide newspaper" exception to the Investment Advisers Act, plaintiff brought an action against the New York Post after the paper refused to publish one of its tombstone advertisements. Plaintiff alleged that because defendant had a policy of selective publication of tombstone ads based on its evaluation of the merits of a proposed offering, it was acting as an undisclosed investment adviser in violation of

the Investment Advisers Act because it was not registered.

The court rejected plaintiff's claim under the Investment Advisers Act finding that defendant was a newspaper of general circulation and therefore, not subject to the Investment Advisers Act. In reaching this conclusion the court noted that defendant had been published daily except Sunday since it was founded in 1801, and even if such were not the case, such a widely known fact would be a fit subject for judicial notice. *Person v. New York Post Corp.*, 427 F.Supp. at 1303.

The Investment Advisers Act recently withstood a constitutional challenge in *SEC v. Lowe*, 725 F.2d 892 (2nd Cir.1984), *petition for cert. filed*, 52 U.S.L.W. 3892 (U.S. June 12, 1984) (No. 83–1911). There, an investment adviser registered under the Act was convicted on three different occasions of misconduct in connection with his investment advisory business. Pursuant to the Act, the SEC revoked his registration because of his convictions. Defendant, nevertheless, continued to publish and sell newsletters containing investment advice and the SEC brought an action to enjoin this activity. The issue presented in the case was whether the publication of such advice is protected by the First Amendment so as to preclude the SEC from seeking to enjoin its continuance. *SEC v. Lowe*, 725 F.2d at 894.

Relying on *Wall Street Transcript*, the Court initially concluded that Defendant could not avail itself of such exclusion because Lowe's publications "are not engaged primarily in 'customary newspaper activities,' but rather in the activities that the Investment Advisers Act is intended to regulate." *SEC v. Lowe*, 725 F.2d at 898. The Court further held that the Act's application to the Lowe newsletters did not violate the First Amendment.

In reaching this decision, the Court reaffirmed its earlier decision in *Wall Street Transcript* that the Act on its face did not violate the First Amendment because

> it is not necessary to enlarge the category of 'bona fide' newspaper into an exclu-

sion for all publications which could conceivably be brought within the term 'typical newspaper' in order to avoid the seeds of a constitutional controversy .... or to base a construction of the Act on the assumption that the activities involved in giving commercial investment advice are entitled to the identical constitutional protection provided for certain forms of social, political or religious expression.

*SEC v. Lowe*, 725 F.2d at 898, *quoting, Wall Street Transcript*, 422 F.2d at 1378–79. The Court also reasoned that the case of *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), in which the Supreme Court invalidated a Virginia statute prohibiting pharmacists from advertising their prices, did not affect the decision in *Wall Street Transcript* because the "provisions of the Investment Advisers Act at issue here are precisely the kind of regulation of commercial activity permissible under the First Amendment." *SEC v. Lowe*, 725 F.2d at 900.

In addition to the case law discussed above, the SEC issued a release in 1977 stating when it would apply the bona fide newspaper exception. It announced that such exception would be applicable "only where, based on the content, advertising material, readership, and other relevant factors, a publication is not primarily a vehicle for distributing investment advice." Applicability of Investment Advisers Act to Certain Publications, 42 Fed.Reg. 2953 n. 1 (1977) (codified at 17 C.F.R. § 276) (citing *Wall Street Transcript*, 422 F.2d at 1371).

Recently in *Sec v. Suter*, 732 F.2d 1294 [current] Fed.Sec.L.Rep. (CCH) ¶ 91,423 (7th Cir.1984), the Seventh Circuit found that an investment newsletter was subject to the Investment Advisers Act and could not avail itself of the bona fide newspaper exclusion. In reaching this decision, the court relied on *Wall Street Transcript* and the 1977 SEC release discussed above. The court observed that the SEC merely adopted the subjective approach of *Wall*

*Street Transcript* in its 1977 release. This Court agrees with that observation.

■ The nature of Defendant's magazine and Defendant's practices prevent Defendant from availing itself of the bona fide newspaper exception to the definition of investment adviser. It is clear from the undisputed facts that Stock Market Magazine is engaged in "practices which the Act was intended to regulate, such as the offering of professional investment advice without revealing the possibility of personal gain to the publisher from what he reports or how he presents it." *Wall Street Transcript Corp.*, 422 F.2d at 1378. The content, promotion, and readership of Stock Market Magazine, support this conclusion. The material facts which are not in dispute and discussed above demonstrate that (1) Defendant promotes Stock Market Magazine as a reliable investment guide to individual investors and the investment community; (2) the readers of Stock Market Magazine are investors and subscribe to the magazine for investment ideas; and (3) the content of Stock Market Magazine is devoted to profiling specific publicly held companies, profiling an industry and the top publicly held companies in that industry and/or providing general investment advice.

In the words of *Wall Street Transcript*, the Defendant cannot avail itself of the exclusion because: (1) Stock Market Magazine places emphasis on particular issues and companies; (2) many of the contributing editors are compensated by public relations firms for writing articles about companies and issues that are published in Stock Market Magazine; and (3) the articles in Stock Market Magazine are offered as investment advice. *Id.* at 1377–78.

■ Defendant's contentions that the language of the exclusion on its face provides inadequate standards and therefore, the SEC has acted unconstitutionally in denying the Magazine status within the exclusion because it has no standards or procedures for making such a determination is unsupported and without merit. As is abundantly clear, there are substantive standards under the Investment Advisers Act which serve as guidance for any publisher who might have questions about its practices. These standards are set forth in the Act itself and, contrary to Defendant's unsupported contention, are self-operative and do not require formal agency rule-making since Congress did not include statutory provisions which would make the sections of the Act in issue inoperative without promulgation of agency rules, regulations or orders.

■ In addition, the standards have been defined by the courts and are further defined by Commission releases. They also have been interpreted and explained by agency examination and application in individual cases raised by no action letters. It is important to note that the Commission's interpretation of its statutes and regulations are entitled to substantial deference. The Supreme Court has long held that "[s]uch deference is particularly appropriate where .... Congress has not acted to correct any misperception of [an agency's] statutory objectives. Unless and until Congress does so we are reluctant to disturb a longstanding administrative policy that comports with the plain language, history, and prophylactic purpose of the Act." *United States v. Rutherford*, 442 U.S. 544, 553–554, 99 S.Ct. 2470, 2475–2476, 61 L.Ed.2d 68 (1978).

For the reasons set forth above, the Court finds that Stock Market Magazine is "primarily a vehicle for distributing investment advice" to the investment community. Accordingly, summary judgment is appropriate for Plaintiff under Count One of the complaint. Defendant is an investment adviser as defined by § 202(a)(11) of the Act and is subject to the registration provisions of § 203.

The second cause of action alleged in the complaint charges Defendant with violation of § 206 of the Advisers Act, 15 U.S.C. § 80b–6, which contains proscriptions against fraudulent practices by investment advisers. The violations allegedly arise out of false and misleading statements publish-

ed in Stock Market Magazine regarding the source and objectivity of Stock Market Magazine feature articles and Defendant's failure to disclose consideration received in connection with the publication of Stock Market Magazine feature articles.

The antifraud provisions of § 206 of the Advisers Act relevant to the second cause of action in the Complaint read:

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme or artifice to defraud any client; and

(2) to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client . . . .

15 U.S.C. § 80b–6(1), (2).

■ Section 206 was enacted to benefit the clients of investment advisers. *Transamerica Mortgage Advisers, Inc. v. Lewis*, 444 U.S. 11, 17, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979). To that end, "section 206 established 'federal fiduciary standards' to govern the conduct of investment advisers." *Id.* at 17, 100 S.Ct. at 246. As part of these fiduciary standards, the Supreme Court has interpreted the Investment Advisers Act to require the investment adviser to disclose all conflicts of interest which might incline it to consciously or unconsciously render advice which is not disinterested. It has imposed upon the investment adviser "an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,'" as well as an affirmative obligation to employ reasonable care to avoid misleading its clients. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. at 191–192, 194, 84 S.Ct. at 282–283, 284.

■ The general standard applied to establish materiality of a false or misleading statement under section 206 is that set forth by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). *Steadman v. SEC*, 603 F.2d 1126, 1130 (5th Cir.1979), *aff'd.*, 450 U.S. 91, 101 S.Ct. 999,

67 L.Ed.2d 69 (1981). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding the matter before him," *i.e.*, in making an investment decision. *Id.*

The Supreme Court has held that information necessary to evaluate the objectivity of investment advice or financial analyses is material and must be disclosed to readers and potential investors. In *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), the Supreme Court affirmed the lower court's decision to grant preliminary injunctive relief under § 206 of the Adviser's Act for defendants' failure to disclose facts going to the objectivity of the author since such factors are "material," and because "suppression of information material to an evaluation of the disinterestedness of investment advice operates as a fraud or deceit on purchases." *Id.* at 200–201, 84 S.Ct. at 287–288. The defendant therein was an investment adviser engaged in the practice of scalping.

In *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir.1979), a financial columnist for the Los Angeles Herald Examiner was charged with fraud under § 10(b) and common law principles for publishing an article containing a favorable description of a public company and for failing to disclose to his readers that he had previously purchased securities of the company and that he would profit, additionally, from republication of the article by the company as an advertisement in a journal in which he held an interest. The court found that "the facts revealing [the columnist's] lack of objectivity were material . . . . Reasonable investors who read the column would have considered the motivations of a financial columnist such as [the defendant] important in deciding whether to invest in the companies touted." *Zweig v. Hearst Corp.*, 594 F.2d at 1266. Although *Zweig* was decided under § 10(b) of the Exchange Act, the Circuit Court compared the section to § 206 of the Advisers Act and found that the requirements of materiality regarding con-

flict of interest "compliment each other." *Id.* at 1267.

Thus, in order for entry of summary judgment against Defendant to be appropriate under § 206(1), the following elements must be shown: (1) Defendant is an investment adviser; (2) Defendant has utilized the mails or interstate commerce to employ a device, scheme, or artifice; (3) said device, scheme or artice violates Defendants fiduciary duty[1] to its readers and subscribers in that it includes false and misleading statements of material fact; and (4) Defendant has acted with scienter. *SEC v. Capital Gains Research Bureau, Inc., supra; Steadman v. SEC, supra.* Under § 206(2) there is no required showing of the fourth element, scienter. All that need be shown is that there is a "nondisclosure of material facts." *Capital Gains Research Bureau,* 375 U.S. at 186, 84 S.Ct. at 280.

Plaintiff contends that Defendant has violated sections 206(1) and 206(2) because it has breached its fiduciary duty and failed to disclose a conflict of interest to its readers and subscribers by publishing materially false and misleading statements in the masthead of the magazine and by its practices and conduct attendant thereto. According to Plaintiff, the statement in the masthead that "feature articles are based on thorough research and first-hand interviews with company officials, economists, security analysts, tax accountants and other experts" implies objectivity which is false and misleading because (1) it does not disclose to readers that certain feature articles are substantially authored by the featured company or its public relations agent; (2) it does not disclose that the featured companies or their public relations agents pay Stock Market Magazine editors to write certain feature articles; and (3) it does not disclose to readers that some featured companies or their public relations agents renumerate Stock Market Magazine for publication of certain feature articles through purchase of reprints and ads. Plaintiff contends that all of this information is material because it would be important to a reasonable Stock Market Magazine reader in making investment decisions.

In the alternative, Plaintiff contends that even absent the implication of objectivity, Defendant has breached its fiduciary duty to its readers by failing to disclose items (1) to (3) discussed above because it has failed to disclose an economic self-interest. In addition Plaintiff contends that the actual claim that the feature articles are based on thorough research and first-hand interviews with company officials and experts outside company management may be false in many instances. According to Plaintiff, in "editing" the drafts supplied by others, Brown admits that in some instances he conducted no interviews other than a telephone call to the company to verify figures and conducted no research other than to check the annual report and other background material supplied by the company.

There is no question that (1) certain featured company articles are substantially authored by the featured company or its public relations agent; (2) that some of the contributing editors of Stock Market Magazine as well as Brown have free-lanced for certain companies and have been paid for the articles that they have written and published in the magazine; and (3) that some public relations agents and featured companies understood that purchase of reprints and ads was *quid pro quo* for publication of a company article. There is also no question that the masthead statement is supposed to relay a sense of objectivity on the part of the magazine. In fact, Brown

---

**1.** Although the Supreme Court has clearly stated that an investment adviser is a fiduciary to his client, *SEC v. Capital Gains Research Bureau,* 375 U.S. at 194, 84 S.Ct. at 284, Defendant argues that an investment adviser is a fiduciary only when there is a personalized relationship between he and his client. According to Defendant, an investment adviser is not a fiduciary when there is an impersonal relationship such as the one here, *i.e.,* publisher and reader. The Second Circuit squarely rejected this personal/impersonal distinction under the Act recently in *SEC v. Lowe, supra,* and this Court does the same. "The Act does not distinguish between 'personal' and 'impersonal' [investment] advice." *Id.* at 896.

admits that such is the purpose of the statement. The question that the Court must decide then, is whether the statement is materially misleading or false.

The Court finds that the statement in the masthead is materially misleading and that failure to disclose the information discussed above is a breach of Defendant's fiduciary duty to its readers. As stated in *Steadman*, 603 F.2d at 1130, "an omitted fact is material if there is a substantial likelihood that a reasonable shareholder [reader] would consider it important in deciding the matter before him." As interpreted in *Capital Gains Research Bureau*, 375 U.S. at 200–201, 84 S.Ct. at 287–288, information going to the objectivity of the author is material. In addition, failure to disclose an economic self-interest constitutes a breach of the adviser's fiduciary duty in violation of section 206 of the Adviser's Act. *Capital Gains Research Bureau*, 375 U.S. at 196, 84 S.Ct. at 285. Finally, the Commission has held in an administrative proceeding that a reprint purchase arrangement, similar to that described by some of the public relations agents in this case, and the receipt of substantial revenue based on sales of article reprints to a featured company create an economic conflict of interest and its non-disclosure violates section 206, as well as section 10(b) of the Exchange Act and 17(b) of the Securities Act. *Willamette Management Associates, Inc.*, Investment Adviser Act of 1940 Release No. 837, 27 SEC Docket 135 (January 17, 1983).

It is clear from the material facts not in dispute that the feature stories selected and published by Stock Market Magazine analyze publicly held companies as favorable investment opportunities for Stock Market Magazine. The facts and the legal precedent establish that there is an economic conflict of interest and a lack of objectivity pervasive in the conduct and practices of Defendant which is material to Stock Market Magazine reader-investors. There is no question that Defendant has violated section 206(2) of the Investment Advisers Act which does not require a showing of intent.[2]

In order to establish a violation of section 206(1) of the Act Plaintiff must establish that Defendant acted with scienter. Advisers Act scienter has been defined by the courts similarly to the definition of Section 10(b) scienter under the Exchange Act, that is intentional, knowing or reckless conduct resulting in the alleged fraud or deceit. *Steadman v. SEC*, 603 F.2d at 1131–1134. As the courts have noted, the terms "knowing" and "intentional" are not synonymous: "Use of the word 'knowing' implies conduct which is somewhat less directed and focused than 'intentional' activity which commonly is characterized by a specific mental state whose animus is to bring about a particular result." *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 45 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). Accordingly, reckless conduct by a defendant is considered to be "knowing" conduct and satisfies the scienter requirement under section 10(b). *Id.; Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023 (6th Cir.1979).

Initially, it is important to note that Defendant, as a corporation, acts through its officers and directors. Martinelli is the sole owner and officer of the Defendant corporation. Brown, the Acting Publisher and Managing Editor, has wide authority for the day-to-day editorial decisions involved in publishing the Stock Market Magazine. As an agent of Defendant, responsible for management and content of Stock Market Magazine, any knowledge that Brown had may be imputed to Defendant on agency principles. *See, Securities and Exchange Commission v. Lum's Inc.*, 365 F.Supp. 1046, 1061 (S.D.N.Y.1973). Defendant is clearly responsible for the

---

2. The record appears to support Plaintiff's contention that the masthead statement, in addition to being misleading, is also false given that Brown has admitted that in some instances he did no independent investigations or interviews of the officials of the featured companies. The Court, however, declines to address this issue given its discussion set forth above.

corporate knowledge and acts of Brown and Martinelli. *Id.*

Plaintiff contends that the facts developed through discovery which are not in dispute justify a finding that Defendant has knowingly, intentionally or at least recklessly published a masthead claim of objectivity of feature stories which is materially false or misleading. The Court agrees with Plaintiff's contention.

First, Martinelli admits that he is familiar with the Stock Market Magazine masthead claims regarding research and first-hand interviews for feature articles and that he published it during the period covered by this law suit. The facts developed through discovery establish (1) that he also had knowledge that a company's annual report might serve as the basis of an article, (2) that some of the company feature drafts are written and supplied by the featured companies or their agents, (3) that Stock Market Magazine contributing editors are often times paid by the featured companies or company agents about whom they write, (4) that some of the contributing editors were employed by the public relations firms while contributing company features to Stock Market Magazine and (5) that featured companies automatically purchase reprints of Stock Market Magazine articles as a "normal kind of thing."

Similarly, Brown was also aware of the masthead statement and stated that the purpose of the claim was to reassure readers that its features are authentic and objective. He was also aware of the facts set forth above and aware that in some instances he did only minor editing before publishing some of the stories verbatim. He was certainly aware that he at times charged a free-lance fee to write a story for a featured company.

 This suggests that Brown and Martinelli, the driving forces and decision makers of Stock Market Magazine, published the misleading masthead with knowledge that it was misleading or at least with reckless disregard that it was misleading. Accordingly, the scienter requirement of section 206(1) of the Advisers Act is satis-fied and summary judgment is appropriate for Plaintiff under Count Two of the complaint.

The third cause of action alleged in the complaint charges Defendant with violation of section 206(4) of the Advisers Act and Rule 206(4)–1, 17 CFR § 275.206(4)–1, thereunder. The alleged violation arises out of Defendant's publication of (1) an annual list of "Best Picks" referring to certain past recommendations without including a list of all such recommendations or a cautionary legend; (2) Kass' low priced stock review with similar omissions; and (3) a testimonial letter to the editor column.

Section 206(4) forbids an investment adviser

to engage in any act, practice, or course of business which is fraudulent, deceptive or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

Pursuant to this grant of power, the Commission enacted Rule 206(4)–1 titled "Advertisements by Investment Advisers."

Rule 206(4)–1 provides in part:

(a) It shall constitute a fraudulent deceptive or manipulative act, practice or course of business within the meaning of section 206(4) of the Act, for any investment adviser, directly or indirectly, to publish, circulate or distribute any advertisement:

(1) Which refers, directly or indirectly, to any testimonial of any kind concerning the investment adviser or concerning any advice, analysis, report or other service rendered by such investment adviser; or

(2) Which refers, directly, or indirectly to past specific recommendations of such investment adviser which were or would have been profitable to any person: *Provided, however,* that this shall not prohibit an advertisement which sets out or offers to furnish a list of all recommen-

dations made to such investment adviser within the immediately preceding period of not less then one year if such advertisement, and such list if it is furnished separately:

(i) State the name of each such security recommended, the date and nature of each such recommendation (e.g., whether to buy, sell, or hold), the market price at that time, the price at which the recommendation was to be acted upon, and the market price of each such security as of the most recent practicable date, and

(ii) contain the following cautionary legend on the first page thereof in print or type as large as the largest print or type used in the body or text thereof: "it should not be assumed that recommendations made in the feature will be profitable or will equal the performance of the securities in this list;" or

(5) Which contains any untrue statement of a material fact, or which is otherwise false or misleading.

Advertisements are defined in the rule as any written communication, notice or announcement which offers any publication concerning securities, or publication which is to be used to determine the purchase or sale of securities. 17 CFR 275.206(4)–1(b). The term advertisement has been read very broadly by the courts. It has been held that any "investment advisory material which promotes advisory services for the purpose of inducing potential clients to subscribe to those services" is an "advertisement" within the rule. *SEC v. C.R. Richmond & Co.*, 565 F.2d 1101, 1105 (9th Cir.1977).

Plaintiff contends that Defendant has violated Section 206(4) and Rule 206(4)–1 because the Letters to the Editors column, the Best Picks column and Jerry Kass' review columns are advertisements within the meaning of the rule and Defendant failed to include all securities recommended during the relevant period or the appropriate cautionary legend.

The following facts with respect to this Count are not in dispute. Defendant published a column entitled "Best Picks" in 1978, 1979, 1980 and 1981 and a Jerry Kass review column in 1979 and 1980. Defendant also publishes a complimentary Letters to the Editor column approximately two-to-four times a year.

The "Best Pick" columns listed 10-to-15 stocks selected by Brown as the best performers of the approximately 50 company stocks analyzed in Stock Market Magazine feature articles during the prior year. According to Brown he researched his selections by reviewing the Stock Market Magazine feature articles and comparing the stock prices therein to the New York Time stock tables to determine the stocks with greatest price increases. The list, however, did not include identification of information regarding the remaining stocks from which the "best picks" were selected. The list also did not include a cautionary legend.

The Jerry Kass review columns contained similar information. Neither of these columns, however, contained a review of all stocks previously analyzed. Nor did they include a cautionary legend regarding the profitability of future recommendations.

According to Defendant, the primary purpose of the Best Picks column, the Jerry Kass review column and the Letters to the Editor column is to promote Stock Market Magazine as an investment adviser to new readers and subscribers. For example, Brown admitted in deposition that the Best Picks column was his idea because, "I thought it's a good self promotional article...." With respect to Kass' review columns, Brown states that its purpose is to bring attention to the successful performance of the recommendations of a Stock Market Magazine columnist and thus promote the sale of Stock Market Magazine. Similarly, Martinelli identifies a Letters to the Editor column as a "puff thing" in which a reader says "I would like to thank you people for your expert advice because this 3-year subscription has been paid for many times over."

■ Given the statements of Brown and Martinelli, it is clear that the Best Picks column, Jerry Kass' review column and the Letters to the Editor column are advertisements within the meaning of Rule 206(4)–1(b). Such columns constitute advertisements because they are materials "which promote advisory services for the purpose of inducing potential clients to subscribe to those services." *SEC v. C.R. Richmond & Co.*, 565 F.2d at 1105.

Given that the Court finds that such columns are advertisements within the meaning of the regulation, it is clear that Defendant is in violation of the rule. The facts in this case are similar to those in *In the Matter of National Counselor Reports, Inc.*, 1981 Fed.Sec.L.Rep. (CCH) ¶ 82,860 where an investment adviser published an article on past stock recommendations which included only selected stocks that had experienced price increases since the original recommendation. The article likewise did not include any cautionary legend as to the future predictions as required by Rule 206(4)–1(a)(2). The Commission issued an administrative ruling finding defendant in violation of Rule 206(4)–1(a)(2).

■ Stock Market Magazine's Best Picks column and Kass' review columns violate Rule 206(4)–1 by (1) failing to identify all securities recommended during the relevant year; and (2) failing to carry the required cautionary legend. The Letters to the Editor column testifying to the "expert advice" of Stock Market Magazine and utilized to promote Stock Market Magazine is prohibited altogether under Rule 206(4)–1(a)(1). Accordingly, summary judgment for Plaintiff on Count Three of the complaint is appropriate.

### Section 10(b) of the Securities Exchange Act and Rule 10b–5

The Fourth Count of the complaint charges Defendant with violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5. The alleged violation arises out of false and misleading statements made in the Stock Market Magazine masthead discussed above.

Section 10(b) provides that:

It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— (b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality or interstate commerce, or of the mails, or of any facility of any national securities exchange (a) to employ any device, scheme or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

■ In order to prevail on this Count, Plaintiff must establish the following elements (1) employment of a fraudulent device, scheme or artifice through the use of interstate commerce or the mails; (2) false and/or misleading statements of material fact; (3) conduct occurring in connection with the purchase or sale of a security; and (4) conduct occurring with scienter. *SEC v. Texas Gulf Sulphur Company*, 401 F.2d 833 (2d Cir.1968), *cert. denied sub nom.*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

Plaintiff contends, and the Court agrees, that elements one, two and four have already been established in the discussion under the Investment Advisers Act of 1940. The only remaining issue under this Count therefore, is whether, as a matter of law, the conduct discussed above occurred in connection with the purchase or sale of a security.

This element of section 10(b) has been construed by the Supreme Court as encompassing deceptive conduct merely "touching" the purchase or sale of securities. *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1972). The United States Court of Appeals for the District of Columbia Circuit has noted that the "in connection with" requirement may be met "whenever it may reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities in reliance thereon." *SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1171 (D.C.Cir.1978), *cert. denied sub nom., Zimmerman v. SEC*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979), *later app., SEC v. Savoy Industries, Inc.*, 665 F.2d 1310 (1981).

▇▇▇ In this case, the false and/or misleading statements published in the Stock Market Magazine are clearly made in connection with the purchase and sale or securities. As discussed above, the thrust of the magazine is to encourage readers to buy securities; the articles recommend investment, *i.e.*, purchase or sale of the securities of the featured companies.[3] Therefore, in this case, Defendant's false and misleading statements "touch" securities transactions. *Superintendent of Insurance v. Banker's Life and Casualty Co.*, 404 U.S. at 12, 92 S.Ct. at 169. The information disseminated by Defendant may be expected to "cause reasonable investors to buy or sell securities in reliance thereon." *SEC v. Savoy Industries, Inc.*, 587 F.2d at

1171. Accordingly, the "in connection with" element of section 10(b) fraud is satisfied and Plaintiff's motion for summary judgment under Count Four of the complaint is granted.

*Section 17(b) of the Securities Act of 1933*

The Fifth and final Count of the complaint charges Defendant with violation of Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b), for failing to disclose the consideration it receives for publishing feature articles analyzing and describing publicly held companies as investment opportunities. The alleged consideration is in the form of writer's fees and revenue from feature article reprints and advertising.

Section 17(b) of the Securities Act provides:

(b) It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

In *United States v. Amick*, 439 F.2d 351, 364–65 (7th Cir.), *cert. denied*, 404 U.S. 823, 92 S.Ct. 48, 30 L.Ed.2d 51 (1971), the Seventh Circuit affirmed, *inter alia*, the criminal convictions of the Indiana Investor, a publishing corporation, and the editor of its weekly publication, for violation of section 17(a) and (b) of the Securities Act. The Indiana Investor and its editor published a report concerning an issuer's corporate acquisition and investment of over $2

---

**3.** Plaintiff has located some readers of Stock Market Magazine who have actually relied on the Magazine in making purchases or sales. Given that the elements of a cause of action under section 10(b) and Rule 10(b)–5 in a SEC

enforcement action do not include reliance, *SEC v. Lum's, Inc.*, 365 F.Supp. 1046, 1060–61 (S.D.N.Y.1973), the Court declines to address such issue.

million. The publication did not disclose that it received consideration from the issuer in the amount of $2,500 for "subscriptions" to the weekly publication. The appellate court upheld the findings that the "subscription" fee was actually payment for publication of the article, and therefore, in violation of section 17(b) noting:

> The purpose of the statute is clear, and was stated in a committee report at the time of passage of the Act as follows:
>
> Section 17(b) is particularly designed to meet the evils of the 'tipster sheet' as well as those articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for.

*United States v. Amick,* 439 F.2d at 365.[4]

As set forth above in the discussion of the Investment Advisers Act, there is no dispute with regard to the fact that many of the "contributing editors" and Brown received money from public relations firms for writing and publishing articles about such firms' clients in Stock Market Magazine. Failing to disclose this clearly violates section 17(b) of the Securities Act. Defendant denies that it receives money from the sale of reprints as consideration for publishing featured articles. Many of the public relations agents themselves, however, testified in deposition that purchasing reprints was *quid pro quo* for publication of a feature article in the Stock Market Magazine. Even assuming however, that the reprint issue is a material fact in dispute, failure to disclose the writer's fees discussed above is itself a violation of section 17(b).

Thus, like the publishers in *Axe Securities, Amick,* and *Willamette,* Defendant has violated Section 17(b) of the Securities Act by publishing descriptions of publicly held companies or their public relations agents without disclosing receipt of the consideration. Accordingly, summary judgment in favor of Plaintiff is appropriate on Count Five of the complaint.

*Appropriate Relief*

Plaintiff has authority to seek and obtain permanent injunctions under section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e), section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and section 20(b) of the Securities Act, 15 U.S.C. § 77t(b). Under section 209(e), a court is empowered to issue an injunction "upon a showing" that a defendant "has engaged, is engaged, or is about to engage in any act or practice constituting a violation" of the Advisers Act. Under sections 21(d) and 20(b), a court is empowered to issue an injunction "upon a proper showing" that a defendant "is engaged or is about to engage in acts or practices constituting a violation" of the Exchange Act and the Securities Act, respectively.

The purpose of injunctive relief under the securities laws is not to punish the violator, but to deter him from committing future infractions. *See SEC v. Koracorp Industries, Inc.,* 575 F.2d 692, 697 (9th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 348, 58 L.Ed.2d 343 (1978). Accordingly, a "showing" for these purposes requires "a finding of 'likelihood' or 'propensity' to engage in future violations." *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 99 (2d Cir.1978).

In considering the likelihood of recurrent violations, courts have held that the existence of past violations gives rise to an inference of likelihood of future violations and the fact that the defendant may be currently complying with the securities

---

**4.** *See also,* In the Matters of Axe Securities Corporation, *et al.,* 1964–66 Fed.Sec.L.Rep. (CCH) ¶ 77,148 (1964) (An investment adviser who published an article describing certain mutual fund companies violated section 17(b) of the Securities Act by failing to disclose that it received consideration from the underwriter of the companies for publication of the article); In the Matter of Willamette Management Associ-ates, Inc., Investment Advisers Act of 1940, Release No. 837, 27 SEC Docket 135 (Jan.17,1983) (Investment adviser violated section 17(b) when it published and distributed a corporate profile about Data Force International, Inc., an issuer, without disclosing that Data Force paid Willamette $2,400 for publication of the profile and 2,000 reprints of the profile).

laws does not preclude an injunction. *See SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir.1975); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2nd Cir.1972). In addition, a court may consider the following factors as bearing on the likelihood of future violation: the degree of scienter involved, the sincerity of a defendant's assurances against future violations, the isolated or recurrent nature of the infraction, and defendant's recognition of the wrongful nature of his conduct. *SEC v. Murphy,* 626 F.2d at 655. *See, e.g., SEC v. Universal Major Industries, Inc.,* 546 F.2d 1044, 1048 (2nd Cir.1976), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

Specifically with regard to an injunction requiring registration as an investment adviser and against violation of Advisers Act fraud, the following factors have been considered:

> (1) the defendant's past persistance in violating the Act despite warnings from the plaintiff; (2) the defendant's apparent belief that his actions were blameless and that the plaintiffs were merely prosecuting him and trying to prohibit his engaging in 'legal' conduct; and (3) the fact that the defendant has apparently failed to pursue registration with the SEC as an investment adviser.

*SEC v. Lindsey-Holman Co.,* 1979 Fed. Sec.L.Rep. (CCH) ¶ 96,704 pp. 94,729–94,-730 (M.D.Ga.1978).

In the present case, the Court finds that the Commission has made a compelling showing that Defendant is likely to commit future violations of the same provisions of the securities laws that it has violated in the past. Notwithstanding notice from Plaintiff forwarded to Defendant in April and June, 1980, the investigation conducted herein during 1980–1981, and finally initiation of this action in July, 1982, Defendant continues to publish Stock Market Magazine without registration as an investment adviser as required by section 203 of the Advisers Act and it continues the practices described above in violation of the fraud sections of the Advisers, Exchange and Se-

curities Act. In fact, when questioned in deposition regarding the old and new Stock Market Magazine masthead, Defendant's owner Angelo Martinelli declared in July, 1983, "I didn't think that, in what we were doing, not do I today, think that we were doing anything wrong."

 In short, a stronger showing of likelihood of future violations could hardly be imagined. Accordingly, the Court issues an injunction requiring Defendant to register as an investment adviser pursuant to section 203 of the Advisers Act and barring further violations of the fraud sections of the Advisers, Exchange and Securities Acts.